Opinion
SOVEN, J.
Summary
In this case, we must decide whether federal law prohibits California from regulating the storage of a hazardous substance, polychlorinated biphenyls (PCB’s). We conclude that the applicable federal law does not preempt California laws on the subject, and that, as a result, the trial court erred in sustaining defendants’ demurrers to the complaint.
Defendants, officers and employees of Todd Shipyards Corporation and the corporation (hereafter Todd Shipyards or defendants), are charged with multiple counts of violating the California Hazardous Waste Control Act (Health & Saf. Code, § 25100 et seq.)[1] specifically, transporting a hazardous waste without a permit, and storing a hazardous waste without a permit.
*Supp. 25 The trial court sustained defendants’ demurrers to the unlawful storage counts. The trial court also denied defendants’ motions to quash a search warrant, to suppress evidence (excepting certain documents), and to dismiss the complaint. Defendants appeal from the orders denying the suppression and dismissal motions; the People appeal from the order sustaining defendants’ demurrers.
We reverse the order sustaining the demurrers and affirm the orders denying defendants’ suppression and dismissal motions.
Facts
On October 19, 1983, an inspection and search warrant was issued on the basis of a 27-page affidavit prepared by Daniel Fresquez, a senior environmental health officer in the Hazardous Waste Control Program of the Los Angeles County Department of Health Services. The affidavit stated that: On September 11, 1983, Fresquez was called to a residential street in Van Nuys where fellow health inspectors showed him an oily black stain in the street, approximately one foot by three feet, and a long trail of the same substance approximately two blocks long. The substance was analyzed and found to contain an extremely hazardous level of PCB contamination.
Fresquez went to the residence nearest the spill and spoke to a man who told him that five days earlier, a friend had picked him up in a truck which contained drums of an oily material which was leaking into the street. This truck was traced to a company, Park Metals, in Chatsworth.
Fresquez went to Park Metals that same day and spoke to the owner, William Park. Park stated that he had picked up some transformers at Todd Shipyards in San Pedro and was in the process of draining the transformers, dismantling them, and disposing of the drained transformer oil.
Fresquez saw six large transformers at the location. The identification plates which usually indicate whether the transformers contain PCB’s had been removed. Park was unable to produce the manifests which are required for the transportation of hazardous wastes by Health and Safety Code section 25160. Park did produce a routine shipping manifest which indicated that the transformers had been picked up at Todd Shipyards on August 31, 1983. Park also stated that a barrel of the oil drained from the *Supp. 26 transformers had been sent to the Mobile Smelting Company in Mojave for incineration. Samples of a black, oily substance gathered from a large puddle near one of the transformers and from the truck which had been earlier identified revealed extremely hazardous levels of PCB’s.
A short time later, Fresquez spoke by telephone to William Huffman, the owner of Mobile Smelting Company. Huffman stated that he had received 16 drums of oil from Park Metals. Huffman stated that William Park had told him that the oil contained PCB’s.
On September 13, 1983, Fresquez conducted a warrantless inspection of the Todd Shipyards facilities in San Pedro. There, defendant Douglas Law-head confirmed that the transformers at Park Metals had come from Todd Shipyards and produced a routine shipping manifest reflecting the transaction. Upon request, employee Rocky Bonura showed Fresquez where these transformers had been stored prior to shipment. Seven transformers were currently in this storage yard, one of which was tipped over and leaking. The transformers were not labeled and were not stored in a posted, secure area, as required by California Administrative Code, title 26, section 66535. None of the four Todd Shipyards employees Fresquez asked could state with certainty how many other transformers were stored at the facility. Several samples were taken from leaking transformers, one of which revealed hazardous levels of PCB’s.
On September 14, 1983, William Park of Park Metals appeared at a Los Angeles County Health Department Hazardous Waste Control Program hearing and stated that Tom Logudice of Tom Logudice Machinery Sales had met him at Todd Shipyards and directed him to the transformers which he then hauled away. Park stated that he had agreed to pay Logudice $1,600 for the copper coils salvaged from within the transformers.
On September 15, 1983, Fresquez returned to Todd Shipyards and, pursuant to California Administrative Code, title 26, section 66328 and Health and Safety Code section 25185, requested the production of documents pertaining to the disposal of the PCB transformers. Employee Bonura produced a bid proposal by the General Electric Company Instrumentation Group, which listed the cost of disposing of six PCB transformers as approximately $43,000. Another document reflected an offer by Tom Logudice Machinery Sales to sell to Todd Shipyards two new transformers, and offering a “trade-in allowance” of approximately $20,000 for nine used transformers in Todd Shipyards’ possession. Employee Bonura refused to allow Fresquez to copy these documents. Further, although Todd Shipyards employee Rich Boatman had stated two days earlier that the General *Supp. 27 Electric Company Instrumentation Group had conducted tests to determine which transformers contained PCB’s and that there was a log indicating the results of these tests, Bonura stated that both the log and test data did not exist.
On October 14, 1983, Fresquez contacted the California Department of Health Services and learned that neither Park Metals Company, Todd Shipyards, Tom Logudice Machinery Sales, nor Mobile Smelting Company were licensed to transport hazardous wastes. Fresquez also learned that none of these companies were licensed to treat, store, or dispose of PCB’s or other hazardous wastes.
Fresquez concluded in the affidavit that he had probable cause to believe and did in fact believe Todd Shipyards was engaged in the storage of hazardous wastes in violation of Health and Safety Code section 25191, subdivision (b)(2), and that he had probable cause to believe that Todd Shipyards had documents in its possession relating to the storage, transportation, and disposal of hazardous wastes which he was authorized to inspect pursuant to Health and Safety Code section 25185.
On October 19, 1983, a magistrate issued the requested inspection and search warrant. The warrant stated that there existed “probable ... cause for believing that there are conditions in and upon the ... described premises of Todd ... which conditions constitute a violation of Health and Safety Code sections 25100 et seq., which relate to public health and safety.” Following a description of the premises, the warrant stated: “Said inspection shall include any and all equipment or material, by whatever name known, owned, operated or leased by Todd Pacific Shipyards Corporation, capable of being utilized to violate, or facilitate the violation of the aforementioned Health and Safety Code statutes. Said inspection shall encompass the physical condition, labeling, designations, or any wording on the above-mentioned equipment, storage tanks or materials. Said inspection may allow the on-premises operation of equipment, valves or material, the on-premises securing and removal of samples of possible industrial waste or hazardous waste, the taking of photographs, and the inspection and photocopying of records relating to the violation of law set forth hereinabove, specifically including records, memoranda, notes, logs, brochures, manifests, flow charts or schematics, weighmaster receipts, purchase orders, billings, proposals, contracts, test data, waste analysis, plans, routine inspection reports, self-monitoring reports, manifests, work orders, and account or log books relating to volumes of wastes received, processed, treated, generated, hauled, disposed or stored at the above-mentioned facility. In addition, said inspection is to include any payroll and corporate records relating to the relationship of employees with Todd Pacific Shipyards Corporation. Said inspection shall also encompass the inspection and copying *Supp. 28 of computer tapes of the operation of any computer for the purpose of producing a printout of records relevant to the purposes set forth herein.”
On the next morning, October 20, 1983, Fresquez and seven other officials from interested agencies executed the inspection and search warrant at Todd Shipyards. Two Los Angeles deputy city attorneys, Richard Kravetz and Barry Groveman, were also present in an advisory capacity. The search team broke up into a number of inspecting parties. Fresquez went first to Bonura’s office and was met there by defendant Frank McElhill. Fresquez gave defendant McElhill a copy of the warrant.
Documents kept in the offices of several Todd Shipyards employees were inspected and some were copied on the scene and then returned. The search team asked for documents relating to transformers or the generation, treatment, or disposal of hazardous wastes and either defendants or their secretaries brought the files to them.
During the search, defendant McElhill spoke to Deputy City Attorney Barry Groveman and represented that he was an attorney. He said that there were certain documents in his office for which he asserted an attorney-client privilege. Groveman indicated that he would honor that privilege at that time.
All of the documents obtained from defendant William Flicker’s office were produced by his secretary pursuant to Flicker’s instructions. William Jones of the search team reviewed the documents and brought those which appeared relevant to Fresquez for copying. Jones did not notice that some of those documents were stamped “attorney-client privilege” and neither Flicker nor his secretary indicated that any of the files they produced were confidential nor did they point out the attorney-client privilege stamp on the files. Fresquez was given two documents stamped “attorney-client privilege" by employee Bonura.
Fresquez noticed that two of the documents from Bonura’s office and several of the documents from defendant Flicker’s office bore the attorney-client stamp and brought the matter to the attention of Deputy City Attorney Groveman. Groveman indicated that these documents could be copied. Groveman later stated that some of the reasons for this decision were that these documents had defendant McElhill’s name on them but that defendant McElhill had specifically asserted an attorney-client privilege only as to certain documents kept in his office. No assertion of confidentiality was made as to documents in other offices even though McElhill was present while Fresquez was examining the documents from Bonura’s office. Addi *Supp. 29 tionally, Groveman said that he was aware that these documents had not been found in a lawyer’s office.
It was later learned that these documents were copies of employee statements which had been collected by defendant McElhill at the direction of the law firm of Parker, Milliken, Clark, O’Hara & Samuelian. Although defendant McElhill testified that these statements were confidential and that each employee had a copy of only his or her own statement, statements of both employees Bonura and James Madison were found in Bonura’s office. Multiple copies of the statements of defendant Ed Hickey, defendant Cal Simmons, employee Kay Cortez, and defendant Flicker were found in Flicker’s office.
Deputy City Attorney Kravetz later read each of the employee statements copied during the October 20 search. The People stipulated that he read the employees’ statements to determine what evidence could be useful at trial. Kravetz also testified that “virtually every substantive factor” contained in those documents was also reflected in the oral statements of those employees which had been obtained independently by investigators, and that the seized documents were not used in determining how to proceed in the instant prosecution.
On October 25, 1983, Fresquez telephoned defendant McElhill and then returned to McElhill’s office to continue his inspection and search pursuant to the warrant. Fresquez asked for those documents having to do with hazardous wastes and transformers and also asked for documents having to do with reports filed by employees concerning this matter. Defendant McElhill responded that he had no problem with his files being reviewed, with the exception of one stack of documents which he identified. He stated that he was consulting with Todd Shipyards’ attorneys and that he would let Fresquez know by 4 p.m. whether he would turn them over to Fresquez. Fresquez agreed and called Deputy City Attorney Groveman to discuss the situation.
Deputy City Attorney Groveman initiated a conference call on October 20, 1983, with Todd Shipyards’ attorneys and the magistrate who issued the warrant. The magistrate ordered that the disputed documents be sealed and delivered to her court by Fresquez. Those documents currently remain sealed.
The trial court denied defendants’ motion to quash the warrant, finding that it was supported by a showing of probable cause and that the warrant sufficiently described the items to be seized. The trial court granted defendants’ motion to suppress all documents obtained from defendant Attorney McElhill’s office. The trial court also granted defendants’ motion to *Supp. 30 suppress the documents stamped “attorney-client privilege”, taken from offices other than the office of Attorney McElhill and any fruits thereof, but denied the motion for dismissal.
Discussion
1. Search Warrant
Defendants’ contentions that there was no statutory authority to support the issuance of a warrant and that the warrant is overbroad are without merit.
The “Inspection and Search Warrant” in this case was issued under Code of Civil Procedure sections 1822.50 through 1822.59, which generally regulate the issuance of inspection warrants, and Health and Safety Code section 25185, which authorizes inspections, with or without a warrant, to “carry out” the purposes of the Hazardous Waste Control Act.[2]
 Generally, a warrant to conduct an administrative inspection and search of commercial property need not be supported by the traditional showing of probable cause if the search is not being conducted to gather evidence of criminal activity. (See v. City of Seattle (1967) 387 U.S. 541, 545 [18 L.Ed.2d 943, 947, 87 S.Ct. 1737].) Defendants correctly assert that where, as here, evidence of criminal activity is sought, the warrant under which the search is conducted must be supported by probable cause. (Michigan v. Clifford (1984) 464 U.S. 287, 294 [78 L.Ed.2d 477, 484, 104 S.Ct. 641]; Salwasser Manufacturing Co v. Municipal Court (1979) 94 Cal.App.3d 223, 234 [156 Cal.Rptr. 292].) There is, however, no authority to support defendants’ contention that authorities who wish to conduct such a search must obtain a warrant which is labeled “criminal search warrant.” Rather, the primary object of the search is controlling. (Michigan v. Clifford, supra, 464 U.S. 287, 294 [78 L.Ed.2d 477, 484].) Where government agents are seeking evidence of criminal activity under an administrative warrant issued pursuant to the Code of Civil Procedure, the warrant must have been obtained as the result of a showing of the traditional probable cause required when such warrants are issued pursuant to the Penal Code.
Defendants point out that a “search warrant” could not have been issued under Penal Code section 1524 because a warrant issued under the Penal Code may issue for evidence of a crime only if that crime is a felony. *Supp. 31 (Pen. Code, § 1524, subd. (a)(4).) It does not follow, and it makes little sense, that the Legislature intended the type of activity alleged here—storage of an extremely hazardous substance—to be exempt from nonconsensual investigation.[3] Rather, accepting that the Legislature generally intended that evidence of misdemeanors could not be removed from the premises and brought before a magistrate (Pen. Code, § 1523), the Legislature clearly intended that law enforcement authorities were entitled to inspect, to copy, to photograph, and to remove samples in connection with the Hazardous Waste Control Act. (Health & Saf. Code, § 25185.)
Defendants rely on Michigan v. Clifford, supra, 464 U.S. 287 for the proposition that a search warrant based on probable cause must be issued under the Penal Code. That case, involving a purported administrative search in the State of Michigan, did not so hold. Rather, the court held that if the “primary object of the search is to gather evidence of criminal activity, a criminal search warrant may be obtained only on a showing of probable cause to believe that relevant evidence will be found in the place to be searched.” (464 U.S., at p. 294 [78 L.Ed.2d at p. 484].) Probable cause to believe that “relevant evidence will be found” is in this case, as described above, overwhelming, and defendants do not contend to the contrary.
Defendants next contend that the warrant failed to describe the place to be searched and the things to be seized with particularity and the warrant was facially overbroad. Defendants specifically challenge the following statements contained in the warrant: “[A]ny and all equipment or material, by whatever name known, owned, operated or leased by Todd Pacific Shipyards Corporation, capable of being utilized to violate, or to facilitate the violation of the aforementioned Health and Safety Code statutes. [sections 25100 et seq.] [T]he on-premises operation of equipment, valves or material, the on-premises securing and removal of samples of possible industrial waste or hazardous waste, the taking of photographs, and the inspection and photocopying of records relating to the violation of law set forth hereinabove.”[4]
The test whether a warrant describes items with sufficient particularity is whether “the warrant ‘imposes a meaningful restriction upon the *Supp. 32 objects to be seized’ [Citation.] The ‘reasonable particularity’ required is a flexible concept, reflecting the degree of detail available from the facts known to the affiant and presented to the issuing magistrate.” (People v. Tockgo (1983) 145 Cal.App.3d 635, 640 [193 Cal.Rptr. 503]).
When circumstances make an exact description of items a virtual impossibility, the description may permissibly be limited to the generic class of items sought. The warrant will not fail if the place to be searched and the items to be seized are as precisely identified as the nature of the suspected criminal activity permits and the warrant does not authorize a mere exploratory search. (Toubus v. Superior Court of Marin County (1981) 114 Cal.App.3d 378, 386 [170 Cal.Rptr. 697] [“ ‘any papers or writings, records that evidence dealings in controlled substances’ ”]; People v. Barnum (1980) 113 Cal.App.3d 340, 347 [169 Cal.Rptr. 840]; People v. Barthel (1965) 231 Cal.App.2d 827, 832 [42 Cal.Rptr. 290].)
In this case, the object of the search was not for items such as stolen merchandise, which can be described in great detail, but for evidence showing defendants had committed multiple violations of statutes regulating the storage, transportation, and disposal of hazardous waste. The warrant sufficiently identified the items to be inspected, copied or photographed with the degree of particularity which could reasonably be expected under the circumstances. (People v. Barnum, supra, 113 Cal.App.3d at p.347; People v. Barthel, supra, 231 Cal.App.2d at p.832.)[5]
Defendants next contend that the trial court erred in denying their motion to dismiss the case, on the grounds that the People infringed upon defendants’ attorney-client relationship and their right to counsel. The trial court’s order denying dismissal is not appealable at this stage in the proceedings. (Pen. Code, § 1466.) While defendants assert that a pretrial appeal of the order is permitted under Penal Code section 1538.5, that section provides solely for suppression of evidence as a remedy (§ 1538.5, subd. (d)), a remedy that defendants have already obtained. (See People v. Ahern (1984) 157 Cal.App.3d 27, 32-33 [204 Cal.Rptr. 11].) Dismissal is permitted only on the court’s motion under Penal Code section 1385. (§ 1538.5, subd. (j).)
Moreover, even if properly before us, defendants’ contention has no merit. Although, as recognized by the trial court, the prosecutors acted improperly in seizing copies of documents marked “Attorney-Client Privi *Supp. 33 lege,” those documents were found in the offices of various nonattomey employees, and multiple copies of the documents were found, factors which mitigate the prosecutor’s conduct. Although the employees’ statements were copied to determine what evidence could be useful at trial, a deputy city attorney testified that “virtually” everything contained in the documents had been obtained independently by the investigators. Defendants declined to show that the statements were important or that they had been prejudiced by the exposure of their statements.
Dismissal is an inappropriate sanction absent any showing that a defendant has been prejudiced by the wrongful act of the prosecutor. (See People v. Fulton (1984) 155 Cal.App.3d 91, 99-100 [201 Cal.Rptr. 879].) The court’s order suppressing the statements and the fruits thereof was sufficient. Barber v. Municipal Court (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], relied on by defendants, does not apply. The court in Barber “concluded that an exclusionary sanction would not adequately protect the defendants’ rights, in part because in order to enforce that sanction the defendants would have been forced to divulge the full contents of conversations to which the police informant, but not the prosecutor, had been privy.” (People v. Towler (1982) 31 Cal.3d 105, 122 [181 Cal.Rptr. 391, 641 P.2d 1253].)[6] Here, no such disclosure is required. The trial court did not err.
2. Preemption[7]
Defendants are charged with storing PCB’s, a hazardous substance, in 1982 and 1983, in violation of the California Hazardous Waste Control Act (HWCA). (Health & Saf. Code, § 25191, subd. (d).) The storage of PCB’s is also regulated by federal law. (15 U.S.C. § 2601 et seq.) Under California law at that time, hazardous wastes could be stored for 60 days without a permit. (Health & Saf. Code, § 25201; Stats. 1980, ch. 878.) Under federal law at the time, such wastes could be stored until January 1, 1984, or for a year without a permit. (40 C.F.R., § 761.65(a).)
The trial court, in sustaining defendants’ demurrers to 277 counts of violating of Health and Safety Code section 25191, subdivision (b)(2), ruled that California’s hazardous waste storage regulations, as applied to PCB’s, *Supp. 34 are preempted by the federal Toxic Substances Control Act (TSCA) (15 U.S.C. § 2601 et seq.). The trial court erred.
It is well settled that Congress may, within constitutional limits, preempt state authority by so stating in express terms. In areas that are traditionally part of the police powers of the state, preemption will be found only if the clear and manifest purpose of Congress is to preempt. (Jones v. Rath Packing Co. (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 613-614, 97 S.Ct. 1305]; Rice v. Santa Fe Elevator Corp. (1947) 331 U.S. 218, 230 [91 L.Ed 1447, 1459, 67 S.Ct. 1146].)
In enacting the TSCA, Congress explicitly provided for the issue of preemption. Title 15 United States Code section 2617, provides, as relevant: “(a) Effect on State law [¶](l) Except as provided in paragraph (2), nothing in this chapter shall affect the authority of any State ... to establish or continue in effect regulation of any chemical substance, ... [¶](2) Except as provided in subsection (b) of this section—... [¶](B) if the Administrator prescribes a rule or order under section 2604 or 2605 of this title (other than a rule imposing a requirement described in subsection (a)(6) of section 2605 of this title) which is applicable to a chemical substance ... no State... may ... establish or continue in effect, any requirement which is applicable to such substance ... unless such requirement ... (ii) is adopted under the authority of the Clean Air Act or any other Federal law,... [Italics added.] [¶](b) Exemption [¶]Upon application of a State ... the Administrator may by rule exempt from subsection (a)(2) ... a requirement of such State____”
Section 2605(a), referred to in section 2617 quoted above, provides as relevant: “ ... the Administrator shall by rule apply ... the following requirements ... (6)(A) A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance ...”
In plainer English, section 2617 says that if the EPA exercises its rule-making power, state laws are preempted, unless the state laws regulate the disposal of certain substances or the state laws are adopted under the authority of any other federal law.[8] However, even as simplified, the federal legislation does not clearly decide the issues involved in this case: Does the parenthetical exception, which refers to section 2605(a), include PCB’s, which are regulated under section 2605(e)? Does the reference to “disposal” in section 2605(a) include “storage”? Does the exemption in section 2617(a)(2)(B)(ii) for state laws adopted under the authority of “any other *Supp. 35 Federal law” mean the “other Federal law” must directly regulate PCB’s? Must a state in any event apply for an exemption under section 2617(b)?
No case has squarely decided whether the storage of PCB’s is exempted from preemption under either the parenthetical clause of section 2617(a)(2)(B) or the “other Federal law” exception of section 2617(a)(2)(B)(ii). The existing authority, however, supports our conclusion that California laws regulating the storage of PCB’s are exempt from preemption, first, under the parenthetical clause of section 2617(a)(2)(B), and, second, under the “any other Federal law” exception of section 2617(a)(2)(B)(ii).
A. Parenthetical Exception.
Section 2617(a)(2)(B) clearly provides that state laws such as California’s HWCA are preempted unless they involve a rule “imposing a requirement described in subsection (a)(6) of section 2605” — which relates to rules governing the “disposal” of a hazardous substance. We conclude that the exemption applies to state laws involving a requirement “described” in section 2605(a)(6), even though EPA regulations governing PCB’s were enacted pursuant to the authority of section 2605(e).
First, the EPA has consistently taken the position that state laws regulating the disposal of PCB’s are exempt from preemption. (43 Fed. Reg. 7150, 7153 (1978); 44 Fed. Reg. 31514, 31528 (1979).) That interpretation is entitled to considerable deference. (E.g., Ford Motor Credit Co. v. Milhollin (1980) 444 U.S. 555, 566 [63 L.Ed.2d 22, 31, 100 S.Ct. 790].)
Second, the parenthetical exception refers to rules imposing a requirement “described” in section 2605(a)(6), not requirements adopted “under the authority” of section 2605(a)(6). The significance of this broader language was explained in Potomac Elec. Power Co. v. Sachs (D.Md. 1986) 639 F.Supp. 856, 860,[9] and is convincing. The court, in ruling that the parenthetical exception applied to the disposal of PCB’s, stated: “[Plaintiff] argues that because Federal PCB regulations were promulgated under § 2605(e) and not under § 2605(a) of [TSCA], regulations cannot be considered as a rule imposing a requirement described in § 2605(a)(6). In effect, [plaintiff] is asserting that PCB disposal regulations are to be treated differently than disposal regulations of all other toxic substances regulated by the Administrator.
*Supp. 36 “Plaintiff’s assertion is irreconcilable with the plain language of the statute and would require a finding that the words ‘described in’ have the same, meaning as ‘promulgated under.’ The Court is unwilling to reach such a conclusion. In construing statutory language, courts must interpret the words according to their plain meaning. [Citation.] The two phrases have entirely different meanings, and it is logical to conclude that the regulation of a substance can be promulgated under a separate provision of the statute but can nonetheless prescribe disposal requirements described in § 2605(a)(6). The words ‘described in’ allow for a broader scope than the substances regulated under § 2605(a); they govern any requirement describing a disposal regulation.
“There is a clear explanation for Congress’ having treated PCBs differently from all other toxic substances to be regulated by the Administrator. At the time of the passage of [TSCA], PCBs were already known to be extremely toxic, and Congress wanted to express a sense of urgency and a need for immediate regulation.” (639 F.Supp. at pp. 860-861 [italics in original]; see also Chappell v. SCA Services, Inc. (C.D.Ill. 1982) 540 F.Supp. 1087, 1097-1098.)[10]
Rollins Environmental v. Parish of St. James (5th Cir. 1985) 775 F.2d 627, relied on by defendants, rejected without analysis the contention that the parenthetical exception includes PCB’s and is not convincing. (775 F.2d at p. 634, fn. 7.)
Defendants contend that, even assuming Potomac correctly interpreted the parenthetical exception, section 2605(a)(6) refers to “disposal,” while the state laws involved here regulate “storage.” Defendants correctly point out that EPA provides separate definitions for “disposal” and for “storage for disposal.” (40 C.F.R. § 761.3.) “Storage for disposal” is defined as “temporary storage of PCB’s that have been designated for disposal.” “Disposal” is, however, very broadly defined. The word means to “intentionally or accidentally to discard, throw away, or otherwise complete or terminate the useful life of PCB’s and PCB Items,” and “includes spills, leaks, and: other uncontrolled discharges or PCB’s as well as actions related to containing, transporting, destroying, degrading, decontaminating, or confining PCB’s and PCB Items.” We conclude that this definition of disposal neces *Supp. 37 sarily encompasses “storage.” (See SED, Inc. v. City of Dayton (S.D.Ohio 1981) 519 F.Supp. 979, 985, fn. 5; Potomac Elec. Power Co. v. Sachs, supra, 639 F.Supp. 856, 861, fn. 5.)
Moreover, we note that EPA and the State of California entered into an enforcement agreement under the Resource Conservation and Recovery Act (RCRA) in December 1984 which states that state regulation of “storage for disposal” of PCB’s is not preempted under the TSCA. And, on January 4, 1985, the EPA stated, in connection with Maryland’s PCB regulatory program, that “EPA now believes” that “requirements governing storage of PCBs for disposal should be treated the same as state PCB disposal requirements.” (Letter from EPA General Counsel to State of Md. Atty. Gen.)
B. Any Other Federal Law.
The California laws governing the storage of PCB’s are also exempt under section 2617(a)(2)(B)(ii) of the TSCA which exempts state requirements adopted “under the authority of the Clean Air Act or any other Federal law, ...”
The “other Federal law” involved is the RCRA of 1976 (42 U.S.C. § 6926). California’s HWCA, the act involved in this case, derives from the RCRA. Health and Safety Code section 25101 provides: “It is in the best interests of the health and safety of the people of the State of California for the state to obtain and maintain authorization to administer a state hazardous waste program in lieu of the federal program pursuant to Section 3006 of Public Law 94-580, as amended, the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6296). Therefore, it is the intent of the Legislature that the director shall have those powers necessary to secure and maintain interim and final authorization for the state hazardous waste program pursuant to the requirements of Section 3006 ... and to implement such program in lieu of the federal program.”
Defendants point out that this construction of section 2617(a)(2)(B)(ii) would create a chasmic exception to preemption. That was the intent of Congress. In SED, Inc. v. City of Dayton, supra, 519 F.Supp. 979, the court agreed that a local ordinance was exempt from preemption under section 2617(a)(2)(B)(ii). The court in so holding recognized that the city’s contention “would provide nothing less than a ‘gaping hole’ in the express preemption otherwise provided by section 2617(a)(2)(B)...” (519 F.Supp. at p. 989.)
*Supp. 38 “Nonetheless, the Court finds that such far-reaching exception from preemption was contemplated by Congress in enacting section 2617(a)(2)(B)(ii). The legislative history and other parts of the statute evidence a continuing concern that EPA’s broad authority under TSCA might be unwittingly exercised to disrupt the complex environmental regulatory scheme already existing under a variety of other federal statutes administered by the EPA, as well as those administered by other federal agencies whose activities incidentally affect the environment ... For this reason, Congress made it clear that TSCA, although designed as a quite powerful tool, was only to be employed by the EPA as a ‘last resort,’ with preference being given to the prior use of environmental controls under existing legislation. [Citations.]” (Id., at pp. 989-990.)
Defendants contend that the RCRA does not encompass PCS, and therefore California’s PCS storage laws could not be exempt under section 2617(a)(2)(B)(ii) as a requirement “adopted under ... any other Federal law.” However, it does not follow that because the RCRA does not specifically provide for regulation of PCB’s, that a state law, such as California’s HWCA, which derives in part from the RCRA, is not exempt from preemption.
Defendants contend that the state has failed to obtain an exemption from preemption, as authorized by section 2617(b). Plaintiffs contend, and we agree, that no formal exemption is required if the state legislation is exempt under either the parenthetical exception of section 2617(a)(2)(B) or the “any other Federal law” exception of section 2617(a)(2)(B)(ii). To hold otherwise would negate the specific exceptions from preemption. No stated exceptions would be necessary if all state and local laws and regulations required prior approval by EPA under section 2617(b).
C. Actual Conflict.
There is no merit to defendants’ contention that the federal and California rules governing PCB storage are in “actual conflict.” An actual conflict will exist when it is impossible to comply with both federal and state law (Florida Avocado Growers v. Paul (1963) 373 U.S. 132 , 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210]), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. (Silkwood v. Kerr-McGee Corp. (1984) 464 U.S. 238, 248 [78 L.Ed.2d 443, 452, 104 S.Ct. 615].) Defendants could have complied with both California and federal law by obtaining a permit, and it is beyond dispute that the purposes of the TSCA and HWCA are the same; to protect the public health and environment from exposure to certain chemical substances. (15 U.S.C. § 2601; Health & Saf. Code, § 25101, subd. (a).)
*Supp. 39 Defendants contend, relying on a California Auditor General’s report of November 1983, that it was impossible to obtain a permit within 60 days. Even assuming that the California permit program was poorly managed, that fact does not show that a conflict exists on the face of the federal and California laws. Rather, defendants may at trial be able to present a factual defense based on a theory of state-created impossibility of compliance, a matter not before us.
Finally, defendants, insisting that EPA has consistently interpreted the TSCA as preempting California’s HWCA, contend that to apply a recent EPA interpretation to their conduct or a different judicial interpretation would constitute an ex post facto violation of due process. Defendants, however, were not entitled to rely on their interpretation of EPA policy.
Defendants recognize that an administrative interpretation is entitled to considerable weight, based on several factors, including “consistent application of the interpretation over a long period of time; ...” (FEC v. Democratic Senatorial Campaign Comm. (1981) 454 US 27 [70 L.Ed.2d 23, 102 S.Ct. 38].) No such consistency marks EPA’s views concerning preemption of PCB storage. In 1978, EPA stated unequivocally that state requirements for disposal of PCB’s were “completely exempt from Federal preemption” and stated that “disposal” was “defined very broadly to include any action that may be related to the ultimate disposition of a PCB substance, ...” (43 Fed. Reg. 7150, 7153; see also 44 Fed. Reg. 31528 (1979).)[11] Even if defendants were entitled to rely on Administrator Costle’s letter to Representative Ratchford in December 1980 that no state permit was required for the storage of PCB’s, that reliance was undercut by SED Inc. v. City of Dayton, supra, 519 F. Supp. 979, which ruled in 1981 that “disposal” included “storage” (519 F.Supp. at p. 985, fn. 5) and that the parenthetical exception included PCB’s (id., at p. 957), and by Chapell v. SCA Services, Inc. (C.D.Ill. 1982) 540 F.Supp. 1087, 1098, which agreed that PCB disposal regulations were not preempted. Bouvie v. Columbia (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697], relied on by defendants, involved an unforeseen and unforeseeable interpretation of a South Carolina trespass statute (378 U.S. at pp. 355-356 [12 L.Ed.2d at p. 901]), and provides no support for defendants’ position.
Defendants also contend that if the statutes do mean that California’s rules governing the storage of PCB’s are exempt from preemption, the laws are impermissibly vague. Although due process requires adequate *Supp. 40 notice that an act is wrongful, absolute certainty is not required. (E.g., Leffel v. Municipal Court (1976) 54 Cal.App.3d 569, 576-577 [126 Cal.Rptr. 773].)
Defendants here are charged with multiple counts of violating California’s laws prohibiting the storage of hazardous waste at a facility which has not obtained a state-issued permit. California law did not change. If defendants chose to act in defiance of California law, they did so at their own peril. We see no violation of due process.
Conclusion
The trial court correctly denied defendants’ motions to suppress and to dismiss. The trial court erred in sustaining defendants’ demurrers to the complaint. The orders relating to defendants’ motions to suppress and dismiss are affirmed. The orders relating to defendants’ demurrers are reversed.
Cooperman, P. J., and Reese, J., concurred.

 The voluminous amended complaint alleges 341 violations: Health and Safety Code section 25191, subdivision (B)(2) (counts 1-277; 311-337); section 25191, subdivision (b)(1) *Supp. 25 (counts 279, 338); section 25189.5 (counts 278, 280-310); and Penal Code section 182 (counts 339-341). Various sections of the act have been amended but do not affect this case.

 Section 25185 authorizes inspections of facilities, “sampling activities,” including “taking samples” from the premises, inspecting and copying “records, reports, test results, or other information,” and photographing of anything relating to waste or a condition “constituting a violation of law found during an inspection.” The version in effect in 1983 was not significantly different. (Stats. 1980, ch. 878, p. 2758.)

 In 1984, Code of Civil Procedure section 1822.51 was amended to read: “An inspection warrant shall be issued upon cause, unless some other provision of state or federal law makes another standard applicable,” thus enforcing the conclusion that the Legislature did not intend to restrict access by law enforcement to evidence of certain misdemeanors.

 Defendants have no basis to quarrel with that portion of the warrant which authorizes the seizure of “equipment... utilized to violate ... the aforementioned Health and Safety Code statutes,” because no evidence was presented to show that any items were inspected or seized under this portion of the warrant. (E.g., People v. Joubert (1983) 140 Cal.App.3d 946, 952 [190 Cal.Rptr. 23].)

 United States v. Caldwell (9th Cir. 1982) 680 F.2d 75, 77-78 relied on by defendants, is not controlling here and is not controlling in the Ninth Circuit either. (See, e.g., United States v. Offices Known as 50 State Distrib. (9th Cir. 1983) 708 F.2d 1371, 1374. But see United States v. Spilotro (9th Cir. 1986) 800 F.2d 959, 965.)

 The facts of Barber defy comparison. In Barber an undercover police officer infiltrated a protest group, participated in strategy sessions, participated in the demonstration, and then attended and participated in attorney-client conferences. (24 Cal.3d at pp. 746-748.) Under those circumstances, the Supreme Court ruled that the case must be dismissed.

 Defendants’ motions to take judicial notice of the documents included as exhibit A to defendants’ brief, and an Environmental Protection Agency (EPA) interoffice memo dated October 11, 1984, are granted, and the documents have been considered in reaching our decision.

 Other exceptions, not relevant, are stated in 15 United States Code section 2617(a)(2)(B)(i) and (iii).
Hereafter, section references are to the United States Code unless otherwise indicated.

 Potomac Elec. Power Co. v. Sachs (4th Cir. 1986) 802 F.2d 1527, 1532 reversed the district court on grounds that the lower court erred in not abstaining from ruling on the merits, based on the fact that a grand jury proceeding was pending against the plaintiff Potomac Electric.

 Potomac rejected Twitty v. State of N. C. (E.D.N.C. 1981) 527 F.Supp. 778, affirmed without opinion, (4th Cir. 1982) 696 F.2d 992, and Warren County v. State of N. C. (E.D.N.C. 1981) 528 F.Supp. 276, on grounds that those cases involved a total prohibition against disposal of PCB’s in violation of congressional intent. (639 F.Supp. at pp. 862-863.) The distinction is sound.

 Defendants have contended, as discussed above, that neither PCB storage nor disposal is exempt under the parenthetical exception of 15 United States Code section 2617(a)(2)(B).