[No. H000420. Sixth Dist. Apr. 15, 1988.]

LEXINGTON HILLS ASSOCIATION et al., Plaintiffs and
Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents;
WESTAR TIMBER GROUPS et al., Real Parties in Interest and
Respondents.

[No. H000962. Sixth Dist. Apr. 15, 1988.]

COUNTY OF SANTA CLARA et al., Plaintiffs and Respondents, v.
DEPARTMENT OF TRANSPORTATION et al., Defendants and
Appellants;
COAST COUNTY CORPORATION et al., Real Parties in Interest
and Appellants.

[No. H001172. Sixth Dist. Apr. 15, 1988.]

LEXINGTON HILLS ASSOCIATION et al., Plaintiffs and
Appellants, v.
DAVID SOHO et al., Defendants and Appellants.

416

COUNSEL

Douglas B. Allen, Francisco A. Burnett and Burnett, Burnett & Allen for Plaintiffs and Appellants.

Joseph A. Montoya, Norval Fairman and Robert J. DeFea for Defendants and Appellants in No. H000962.

Michael Morrissey, Mindy Caplan and Kurahara & Morrissey for Real Parties in Interest and Appellants.

John K. Van de Kamp, Attorney General, Robert H. Connett, Assistant Attorney General, and Clifford T. Lee, Deputy Attorney General, for Defendants and Appellants in No. H001172 and Defendants and Respondents in No. H000420.

Ronald A. Zumbrun, Robin L. Rivett and Fred A. Slimp II as Amici Curiae on behalf on Defendants and Respondents in No. H000420.

Donald L. Clark, County Counsel, and Robert A. Weers, Deputy County Counsel, for Plaintiffs and Respondents.

No appearance for Real Parties in Interest and Respondents.

OPINION

AGLIANO, P. J.—An association of business entities (collectively "Coast," coincidentally the same landowner/logger involved in *Laupheimer v. State of California, post,* p. 440 [246 Cal.Rptr. 82], which we also decided today) owns property in the Moody Gulch area of Santa Clara County and proposes to cut and remove trees from the property. The proposal has given rise to three lawsuits, each of which has, in turn, led to an appeal to this court. We consider the three appeals together. We conclude there is no legal impediment to the proposed logging. We shall affirm in one instance, reverse in another, and declare the remaining appeal moot.

As in *Laupheimer, post,* opponents of the Moody Gulch logging plan raised a variety of environmental concerns. The Z'berg-Nejedly Forest Practice Act of 1973 ("the Act," Pub. Resources Code, § 4511 et seq.) and administrative regulations ("Rules," Cal. Code Regs., tit. 14, § 911 et seq.) thereunder and the California Environmental Quality Act ("CEQA," Pub. Resources Code, § 21000 et seq.) and its administrative "Guidelines" (Cal.

Code Regs., tit. 14, § 15000 et seq.) are in issue. We discussed these statutes and regulations in *Laupheimer, post,* and shall incorporate that discussion into this opinion as appropriate.

Moody Gulch is a heavily wooded area on the northeasterly slope of the Santa Cruz Mountains, near State Highway 17 which is the principal traffic route between Santa Clara and Santa Cruz Counties. Local homeowners, water districts, and government entities oppose the proposed logging, their concerns focused on potential harm to property and water supply and on Coast's proposal to haul logs on Highway 17.

Coast's proposal was subject to the Act and Rules, relevant provisions of which are described in *Laupheimer, post.* In 1983 Coast filed a timber harvesting plan, as required by the Act, for approval by the California Department of Forestry ("Forestry"). The plan was numbered 5-83-48 SCL.

Before Forestry acted on Coast's timber harvesting plan, several home-owners and water districts (collectively "Lexington Hills") in the Moody Gulch area filed action 535438 ("Moody Gulch I") in the Santa Clara County Superior Court, naming Forestry and other state agencies as re-spondents and Coast and others as real parties in interest, seeking a writ of mandate to establish that the Act and Rules *as written* were invalid because in specified respects they violated the federal and California Constitutions and were inconsistent with CEQA. Ultimately the trial court denied the petition. Lexington Hills appealed. We shall affirm.

After the judgment in Moody Gulch I, Forestry approved Coast's timber harvesting plan. As approved the plan provided, among other things, that harvested logs would be hauled from the property by two routes: One would proceed to Highway 17 by way of Summit Road, and the other directly from the property onto Highway 17. In response to traffic-safety concerns the plan further provided that flagmen and signs were to be placed at the point of direct access from the property to Highway 17. Forestry acknowl-edged that placing of flagmen and signs on Highway 17 would require California Department of Transportation ("Caltrans") "encroachment permits."

Lexington Hills then filed a petition for administrative mandamus under Code of Civil Procedure section 1094.5 (action 572429, "Moody Gulch II"), challenging Forestry's approval of the timber harvesting plan on sever-al grounds. The trial court rejected all but one of Lexington Hills's conten-tions, but as to the one it granted the writ and enjoined logging (1) until Forestry should reconsider plan approval upon the hypothesis Caltrans

would deny encroachment permits relevant to access to Highway 17 and thus compel Coast to haul via Summit Road, evaluating environmental impacts in that event, or (2) "until such time as Caltrans issues an encroachment permit to the harvester for use of Highway 17." Coast and Forestry appealed. (Lexington Hills also appealed, but has not briefed any issue in support of its appeal and is deemed to have abandoned it. *Doran v. White* (1961) 196 Cal.App.2d 676, 677 [16 Cal.Rptr. 841].) In light of our disposition of "Moody Gulch III," below, we conclude that the Moody Gulch II appeal should now be dismissed as moot.

As soon as the trial court filed its order for judgment in Moody Gulch II, Caltrans issued the encroachment permits.

Lexington Hills, joined by the County of Santa Clara and the Town of Los Gatos, then initiated a new action for a writ of mandate, directed to Caltrans and Coast, challenging issuance of the encroachment permits on grounds that Caltrans (1) had not conducted a hearing and (2) had not itself complied with the requirements of CEQA (action 575614, "Moody Gulch III"). The trial court concluded no hearing had been required but that Caltrans had been obliged to comply with CEQA: It ordered Caltrans to vacate the encroachment permits and to comply with CEQA before reissuing them. Caltrans and Coast appealed. We shall reverse.

### Moody Gulch I

Lexington Hills's first action, and its appeal from the adverse judgment in that action, were addressed solely to the abstract validity of the Act and Rules, and not to the propriety of the then-pending procedures by which Coast's timber harvesting plan was to be reviewed. Lexington Hills's contentions are similar to those advanced by the homeowners (represented by the same attorneys) in *Laupheimer, post*. We shall reject those contentions, as we did in *Laupheimer,* for reasons outlined here and stated in more detail in our *Laupheimer* opinion. HD-2]1.  *Constitutional issues.*

■ Lexington Hills contends that the Act and Rules deny procedural due process of law.

We assume for purposes of decision that Lexington Hills has standing to advance its contentions that the Act and Rules afford insufficient notice and an insufficient opportunity to be heard.

With respect to notice, Lexington Hills argues the time period within which a timber harvest plan must be processed is too short, the

dissemination of written notice is too limited, and the specified notice is not sufficiently informative.

We responded to essentially the same contentions in *Laupheimer*. ▉ As we pointed out in *Laupheimer*, the adequacy of notice must be assessed in the circumstances of particular cases. What is required is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652].) ▉ Although the Santa Clara County rules on notice (Rules §§ 925.2-925.3) are not as exhaustive as those of Santa Cruz County, we conclude the notice provisions of the Act and Rules are nevertheless ample to meet due-process standards.

Lexington Hills next argues the hearing procedure is deficient under the due process clauses because members of the general public have no direct right to demand a hearing. But the Constitutions guarantee due process only to persons threatened with deprivation of significant property interests; properly construed the clauses do not extend to the general public. (Cf. *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 612, 616 [156 Cal.Rptr. 718, 596 P.2d 1134].)

As we did in *Laupheimer*, we conclude that the Act and Rules establish hearing procedures which are adequate, as a matter of procedural due process, in the abstract context in which Lexington Hills has chosen to attack them.

2. *Conformity of the Act and Rules to CEQA.*

We discussed the interrelation of the Act and Rules with CEQA and its Guidelines, and the effect of certification of the timber harvesting plan procedures under Public Resources Code section 21080.5, in *Laupheimer*.

▉ As the appellants did in *Laupheimer*, Lexington Hills contends (1) in specified respects the timber harvesting plan procedures do not qualify for certification under section 21080.5, and (2) Forestry was obliged to resubmit the procedures for recertification, in light of subsequent amendments to the Act, but has not done so.

We conclude, for reasons we stated in *Laupheimer*, that Lexington Hills's first contention is time-barred (Pub. Resources Code, § 21080.5, subd. (h)) and that Forestry's implicit decision not to resubmit the timber harvesting

plan procedures neither violates CEQA nor constitutes an abuse of the agency's discretion.

The trial court properly denied all relief upon Lexington Hills's petition. We shall affirm the judgment in Moody Gulch I.

## Moody Gulch III

We turn next to Lexington Hills's third lawsuit, joined in by the County of Santa Clara ("the County") and the Town of Los Gatos, arising out of Caltrans's issuance of encroachment permits at the Highway 17 access points. The question is whether, in the circumstances of record, Caltrans was required to comply with specific provisions of CEQA before it issued the permits.

The logging site for which Coast submitted its timber harvesting plan adjoins two public highways: Summit Road (State Highway 35) at the top of the site and Highway 17 (at a point known as "Moody Curve") at the bottom. At each point there was, at the time Coast submitted its plan, physical vehicular access from the site to the highway over an existing roadway. Coast proposed to remove logs from the site by truck, at the rate of 16 loads per day, using both access points. The Summit Road haul route led to Highway 17 a short distance south of Moody Curve. Thus under the timber harvesting plan all of Coast's logs would ultimately be hauled by log truck on Highway 17.

There has been no substantial expression of concern as to Coast's use of Summit Road. The factual focus of Moody Gulch III is upon Coast's proposed use of Highway 17. The facts are essentially undisputed.

Highway 17 is heavily used by travelers through the Santa Cruz Mountains between Santa Clara and Santa Cruz Counties. It is a route of sharp curves and varying gradients. Traffic often moves faster than the posted speed of 50 miles per hour. Log trucks entering Highway 17 directly from the logging site would be constrained to merge with traffic moving in a generally southerly direction from Santa Clara County toward Santa Cruz County. Approaching the access point the southbound lanes trend slightly downhill and traffic tends to gain speed; after passing the access point southbound traffic must climb steadily to the summit of the mountains. Thus fully-loaded log trucks would be required to enter fast-moving traffic from a standing start and then attempt to gain speed uphill. No one questions the conclusion that the log trucks would exacerbate what is already a difficult situation.

Forestry accepted the timber harvesting plan for filing in November 1983. Its initial inspection report found "no traffic hazards" associated with the Summit Road access. With respect to Moody Curve the report noted the need to merge log trucks with highway traffic. According to the report, "[t]he plan submitter has been advised to contact Cal-Trans regarding encroachment permits or other requirements for entering both Summit Road and State Highway 17 with log trucks."

Forestry scheduled a public hearing for December 1, 1983. At and concurrently with the hearing the County, other local agencies, and private individuals expressed strong opposition to the proposed use of Highway 17, and particularly to entry of loaded log trucks at Moody Curve.

Forestry convened a review team which included local residents, spokesmen from local agencies including the County, and representatives of Caltrans and the California Highway Patrol. The review team recommended, without dissent, that Coast's timber harvesting plan be disapproved on several grounds. In part relevant to the issue before us the report said: "4. It is advised that a traffic safety and coordination plan be developed. The plan submitter and [registered professional forester] should work with the California Department of Transportation and the California Highway Patrol under whose authority highway and vehicle safety are administered."

Thereafter Caltrans wrote two letters to Forestry. In the first, Caltrans said in pertinent part: "a. . . . Slow logging trucks would have an adverse impact on highway operations. The associated traffic impacts should be evaluated and described in more detail, especially concerning access points to Route 17, the amount of traffic generated, sight distance, and proposed mitigation measures.

"b. Logging truck access to Route 17 should be restricted of [sic] off-peak hours.

"c. Work in the State Highway right-of-way (such as the access points) will require an encroachment permit with Caltrans as a responsible agency. . . ."

In its second letter Caltrans detailed its concerns and made specific recommendations: "An overall 'traffic control plan' should be submitted to Caltrans for review and comment. This submittal will probably be in the form of a permit application, since some of the measures will require a permit prior to implementation. There is still some question as to whether the applicant is required a permit to pass through the locked gate at the access point.

"This question will be investigated and resolved when the applicant applies for a permit from Caltrans.

"Some possible traffic handling considerations follow:

"a. Because of the much heavier traffic flows on Route 17 during the summer months, it is recommended that hauling operations not be conducted between Memorial Day and Labor Day.

"b. Because of heavy southbound directional flow during the PM peak period, it is recommended that hauling operations not be conducted later than about [3 p.m.].

"c. Some type of advance signing should be installed to warn oncoming motorists. The most appropriate would probably be a 'Slow Trucks' sign.

"d. With only seven to eight seconds of sight distance, it would be desirable to increase the visibility of vehicles coming from uphill of the entry point. This would be done by stationing a 'spotter' in a position to see further uphill than is possible from the logging truck. The spotter could then signal the driver of the logging truck when safe spacing exists. The spotter could also function as a flagman to warn approaching motorists to slow down during the time a logging truck is entering Route 17."

Caltrans expressed "considerable reservations about slow moving logging trucks entering Route 17 at the proposed access point. . . . [I]t would be quite likely that logging trucks will occasionally pull out in front of relatively high speed and densely packed platoons of vehicles. This increases the probability of last minute lane changing and possible rear-ending of trucks. From a traffic standpoint it would be desirable for the logging operation not to occur. If the operation is to proceed, appropriate traffic measures, such discussed above should be undertaken."

In a separate letter to Forestry, the Highway Patrol recommended use of "prior warning devices" at the Summit Road-Highway 17 junction and "some type of pre-warning plan" at Moody Curve. The Highway Patrol submitted a compilation of speed, acceleration, and reaction calculations which embodied a suggestion that traffic cones might be used to set apart a lane for entry and acceleration by log trucks.

In January 1984 Coast, manifestly in response to the review team's concerns as augmented by the comments of the other agencies, submitted amendments and supplements to its timber harvesting plan, including a provision with respect to traffic: "The proposed encroachment onto HWY.

17 at Moody Curve will have a flagman at the north end of the curve to effectively increase the truck driver's site [*sic*] distance and flag him onto the road when breaks in the traffic are seen by the flagman. This encroachment will not be made after 3 p.m., when commute traffic begins homebound south on HWY. 17. Signs will also be posted at several locations north of the encroachment to alert motorists that slow moving trucks are ahead."

Processing of the timber harvesting plan was then interrupted for a year while Moody Gulch I was litigated to judgment.

In February 1985 Forestry approved the amended timber harvesting plan. In its concurrently-issued major issue statement Forestry recited that many issues had been raised, including "traffic congestion." Forestry commented that "[s]ome of the major issues identified during the review of the timber harvesting plan can not be addressed by the Forest Practice Act or the rules and regulations of the Board of Forestry, because they are outside the authority of that act." With respect to "Major Issue #6 Traffic Safety" Forestry's major issue statement said: "During the public hearing on this timber harvesting proposal, the department received testimony concerning traffic of trucks on Highway 17 and on Highway 35 or Summit Road. This aspect of timber operations in this case was investigated and [Forestry] sought information and recommendations from Cal-Trans and California Department of Highway Patrol. . . . . [Forestry], Cal-Trans, and Highway Patrol anticipate no problem entering onto Summit Road from the timber harvesting site. Highway 17 access from the timber operation poses another problem. This will require the use of flagmen, the obtaining of an encroachment permit and other provisions to allow safe use of the road. The main problem here is that the applicant will have to obtain an encroachment permit from another agency, Cal-Trans, to comply with their rules and regulations under their permit system. [Forestry] does not have jurisdiction over these matters, other than those voluntarily agreed to by the operator. The use of Flagmen on the entrance to Highway 17 is one rule that is available to [Forestry] and was applied as a mitigation measure in this case." Forestry also stated that "[t]raffic and use of public roads are governed by other laws and regulations enforced by the Sheriff's Office, California Highway Patrol, and Cal-Trans."

In March 1985 Coast applied to Caltrans for encroachment permits.

Over the following two months Caltrans, through its "traffic branch," studied the situation in some detail. Among other things the traffic branch recommended specific sign placements and that both deceleration and acceleration areas be paved at the Moody Curve access point, but also concluded

that the Highway Patrol's recommendation to use cones to close one lane was not feasible and that statistics did not support the assumption that slow-moving trucks contribute disproportionately to the accident rate on Highway 17.

In April 1985 Lexington Hills filed Moody Gulch II. After a hearing, the trial court ordered that a peremptory writ issue to compel Forestry either (1) to reconsider the timber harvesting plan in light of the possibility that "no encroachment permit is granted by Caltrans for use of Highway 17" and that all logs would have to be removed via Summit Road, or, in the alternative, (2) to withhold final approval of the plan until the encroachment permits were issued.

Caltrans immediately issued the two encroachment permits which are the subject of Moody Gulch III. One granted permission "to: place temporary warning signs for logging trucks and utilize roadway shoulders for access to brush removal sites" on Summit Road and to place warning signs on Highway 17 near the Summit Road junction. The other, for the Moody Curve access point, granted permission "to: widen existing paved shoulder, place truck warning signs and flashing lights to warn highway traffic on [Highway 17]," upon conditions (among others) that the pavement be widened to specified dimensions to provide a deceleration lane for unloaded log trucks approaching the site along Highway 17 from the north, that on the turnout at the access point Coast pave "an acceleration area onto Route 17" for loaded log trucks leaving the site, and that "[r]adio equipped personnel shall be provided to inform the truck drivers of suitable spaces in the flow of highway traffic." Caltrans certified that it had "considered the Timber Harvest Plan."

One week later the County, Los Gatos, and Lexington Hills filed Moody Gulch III. The trial court concluded in pertinent part that Caltrans should be ordered "to vacate the encroachment permits issued in this matter and to comply with the requirements of CEQA before issuing further encroachment permits" to Coast. A writ of mandate issued. Coast and Caltrans have appealed. The County wrote respondents' brief; respondent Lexington Hills participated in oral argument.

The pertinent "requirements of CEQA" are that any state agency with authority to approve or disapprove a private "project" shall: (1) Determine whether the project is exempt from CEQA. (Guidelines § 15061.) (2) If the project is not exempt, conduct an "initial study" of the environmental impacts. (Guidelines § 15063.) (3) Depending on the outcome of the initial study, *either* (a) Prepare, or to cause to be prepared, an environmental impact report ("EIR") "on any project they propose to . . . approve which

may have a significant effect on the environment." (Pub. Resources Code, § 21100; cf. Guidelines §§ 15064-15065, 15080-15096), *or* (b) Adopt a "negative declaration" to the effect the project will *not* have "a significant effect on the environment." (*Id*. § 21080, subd. (c); Guidelines §§ 15070-15075. Cf. Guidelines § 15002, subd. (k); *No Oil, Inc.*. v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

██ Upon the undisputed facts, the narrow and purely legal question before us is whether Caltrans was obliged, in these circumstances, to "comply with" these CEQA requirements. We conclude Caltrans had no such obligation. Accordingly we shall reverse the judgment in Moody Gulch III.

Respondents advance alternative theories in support of the judgment: (1) Forestry delegated responsibility for environmental review of the anticipated traffic impacts to Caltrans, which thus became responsible for orthodox CEQA compliance.

(2) The timber harvesting plan as ultimately approved by Forestry did not meet criteria stated in the CEQA Guidelines; therefore Caltrans, as an agency "granting approvals for the project," was required to "comply with CEQA in the normal manner" and thus, in this instance, to "prepare an EIR or a negative declaration." (Guidelines § 15253, subd. (c)(2).)

Caltrans acknowledges it did not itself prepare an EIR or a negative declaration. Its position is it was not required to do so in this case. We agree with Caltrans.

1.   *Caltrans's role.*

Each of respondents' theories assumes that the provisions of CEQA were directly applicable to Caltrans in the circumstances of record. Caltrans accepts this assumption, but argues that it was entitled to rely on Forestry's environmental document in lieu of CEQA compliance. The essence of each of respondents' theories is that Forestry did not produce a comprehensive environmental document and therefore that the duty to produce one devolved upon Caltrans.

Caltrans's acceptance of the initial assumption represents a state agency's understandably cautious reading of CEQA. We are not bound by Caltrans's acquiescence in this interpretation of applicable law. We conclude the CEQA provisions did not apply directly to Caltrans in the circumstances of this case, and therefore that the judgment may be affirmed only if Caltrans's asserted duty to comply with CEQA could be *created,* by the acts or omissions of Forestry, where none would otherwise have existed.

Nothing in either CEQA or the Guidelines would impose a duty of compliance upon Caltrans unless it were shown that Caltrans itself had, and proposed to exercise, a power to "approve" a relevant "project."

a. *"Project."*

What was the relevant "project" in this case?

■ Surely it was not merely the series of relatively minimal physical encroachments described in Caltrans's permits, which in and of themselves would be exempt from CEQA. (Cal. Code Regs., tit. 21, §§ 1510, 1510.1; cf. Pub. Resources Code, § 21084, subd. (a).)

The County suggests the project was "the log-hauling operation," implicitly distinguishing the transportation of the logs from the cutting of the trees.

The County's definition is too narrow. " 'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment . . . .

". . . . . . . . . . . . . . . . . . . .

". . . The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines § 15378, subds. (a), (c).) The courts have recognized "the mandate of CEQA that a large project shall not be divided into little ones because such division can improperly submerge the aggregate environmental considerations of the total project." (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 167 [217 Cal.Rptr. 893]; cf. *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024-1025 [192 Cal.Rptr. 325].)

In this instance the "project," for CEQA purposes, encompassed all activities integral to Coast's proposed logging operation, including all logging activities on the site as well as transportation of the logs from the site over public roads.

b. *"Approval."*

■ Did Caltrans possess a power to "approve," in any relevant sense, the project as thus defined?

In this context, power to approve need not have extended to every aspect of the project. If Caltrans's approval were required for any "activity" integral to the project, and if Caltrans could in its discretion deny approval, then Caltrans would have the requisite "discretionary approval power over the project." (Cf. Pub. Resources Code, § 21002.1, subd. (d); cf., e.g., *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 173-175.)

Caltrans has "full possession and control of all state highways and all property and rights in property acquired for state highway purposes" and is "authorized and directed to lay out and construct" them (Sts. & Hy. Code, § 90) and to "improve and maintain" them (*id.* § 91), and "may do any act necessary, convenient or proper for the construction, improvement, maintenance or use" of such highways (*id.* § 92).

Despite the breadth of the statutory language, it is apparent that Caltrans's first responsibility is for the physical aspects of the highways and rights of way. Control and regulation of vehicular *use* of the highways is governed primarily by the Vehicle Code and is entrusted in the first instance to the California Highway Patrol (cf. Veh. Code, § 2400) and other law enforcement agencies. The Vehicle Code contains multiple provisions expressly applicable to operation of log trucks on public thoroughfares. (See, e.g. Veh. Code, §§ 25275 (warning lamps), 26457 (speed limits and stopping distance), 29200, 29800 (transportation regulation), 35414 (length limits), 35552 (gross weight limits).)

Nor does Caltrans's authority over nonfreeway thoroughfares such as Highway 17 and Summit Road include direct power to deny vehicular access to the thoroughfare over existing access routes.

The general rule, applicable to thoroughfares such as these, is that abutting property owners have a right of access to and from their property over the thoroughfare. (Cf. *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 167 [101 Cal.Rptr. 880, 496 P.2d 1248]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349-350 [144 P.2d 818].) The abutting owner may be required to defer to public regulation of the manner and location of access (cf. *Delta Rent-A-Car Systems, Inc.* v. *City of Beverly Hills* (1969) 1 Cal.App.3d 781, 786 [82 Cal.Rptr. 318]; *People* v. *Murray* (1959) 172 Cal.App.2d 219, 225 [342 P.2d 485]), but access itself cannot be impaired, substantially interfered with, or denied without compensation (cf. *Bacich* v. *Board of Control, supra,* 23 Cal.2d 343, 349-350; *People* ex rel. *Dept. Pub. Wks.* v. *Silveira* (1965) 236 Cal.App.2d 604, 612-614 [46 Cal.Rptr. 260]; *Stevenson* v. *City of Downey* (1962) 205 Cal.App.2d 585, 590 [23 Cal.Rptr. 127]).

■■■ Caltrans has no express authority to control access of the type involved here. Caltrans does have statutory authority to grant or to withhold permits for "encroachments" on a state highway (Sts. & Hy. Code, § 670), but this authority does not directly or necessarily relate to highway access. Until amended (after judgment was entered in Moody Gulch III) in respects not pertinent to these issues, the statutory definition provided that " 'encroachment' includes any tower, pole, pole line, pipe, pipe line, fence, billboard, stand or building, or any structure or object of any kind or character not particularly mentioned in this section, which is placed in, under or over any portion of the highway." (*Id.* § 660, subd. (b).) The definition would include signs placed and flagmen stationed within the right of way, but does not extend to entry on, exit from, or use of the highway by a vehicle otherwise properly licensed to use the state highway system.

The physical activity involved in constructing a *new* highway access route will often amount to a highway encroachment subject to Caltrans's control. (See *La Canada Flintridge Development Corp.* v. *Department of Transportation* (1985) 166 Cal.App.3d 206 [212 Cal.Rptr. 334] [a new street was to be physically connected to the highway]; *McCarthy* v. *California Tahoe Regional Planning Agency* (1982) 129 Cal.App.3d 222 [180 Cal.Rptr. 866] [a driveway was to be physically relocated]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 173-175 [a new shopping center, implicitly involving new highway access points, was to be constructed adjacent to a state highway]; cf. *People* ex rel. *Dept. Pub. Wks.* v. *Silveira, supra,* 236 Cal.App.2d 604, 615, fn. 13; cf. also Rules § 925.7(d).) As a practical matter in the case of new construction Caltrans could, by denying the encroachment permit, block construction of and thus deny access over the new route. But in such a case it would be the physical encroachment, and not the right of access itself, which would be directly subject to Caltrans control.

New access is not involved in Moody Gulch III: The record makes clear that Coast had physical access directly from its site to both Summit Road and Highway 17 over existing roadways. Early in the proceedings Caltrans itself questioned whether Coast had a *right* of access at Moody Curve, but that question was not reopened. Respondents argue, briefly and unpersuasively, that the Moody Curve access route had fallen into disuse and would require "reopening" subject to Caltrans control, but there is no showing that resumption of use would involve any physical encroachment for which Caltrans approval would be required. Caltrans now acknowledges that in the circumstances of record it "is bound to allow use of the developed roadways [to Highway 17 and Summit Road] for timber harvesting or suffer inverse condemnation liability."

In sum it is apparent that as initially submitted Coast's timber harvesting plan did *not* incorporate an "activity" which would require Caltrans approval: Given Forestry approval, Coast could properly have hauled logs onto and over Highway 17 without prior Caltrans approval and subject only to Vehicle Code provisions enforceable primarily by the Highway Patrol.

Caltrans was ultimately called upon for encroachment permits, and in this limited sense for "approvals," not for "activities" integral to Coast's timber harvesting plan as initially presented but solely to implement specified *mitigation measures*—flagmen and signs—added to the plan in direct response to environmental concerns expressed by Forestry and by other agencies including Caltrans itself.

These were not "approvals" of Coast's timber harvesting "project" within the meaning of CEQA. The relevant thrust of CEQA is to impose review and reporting requirements upon those agencies with power to approve or disapprove private projects as proposed, and thus to assure among other things that the environmental impacts of such projects will be mitigated wherever feasible. (Cf. Pub. Resources Code, §§ 21002, 21002.1, subds. (a), (b), 21004, 21100, subd. (c); Guidelines § 15370.) It would be an untenable extension of CEQA to impose comprehensive review and reporting responsibilities upon an agency involved in the approval process only to the extent of implementing the desired mitigation measures. In the circumstances of this case Caltrans was not vested with the required approval power and thus was not directly subject to the requirements of CEQA.

It follows that Caltrans had a duty to comply with CEQA only if such a duty could be created by delegation or default.

2. *Delegation.*

To establish delegation, respondents argue that Caltrans "clearly possesses greater responsibility and authority for highway safety involving the present log-hauling operation" than does Forestry, and that Forestry, recognizing "its limited jurisdiction with respect to highway access safety," "depended upon Caltrans to evaluate and mitigate these hazards": "Caltrans, the agency with broader jurisdiction over highway safety, therefore was expected to analyze all of the issues involving safe highway access when the encroachment permit applications were filed."

The record makes clear that in fact Caltrans did make a careful analysis of the highway safety issues, both independently and in consultation with Forestry which had the benefit of the participation and comments of the Highway Patrol. The crux of respondents' argument is that Caltrans was

required to go farther and to prepare the specific findings and recommendations which would be required of a lead agency under CEQA.

The proposition that an agency subject to CEQA for a particular project could effectively delegate its reporting responsibilities to one that is not would, so far as we can determine, be novel, and we find it unattractive. The burden of preparing environmental reports is onerous; in our view the burden is properly to be allocated by the Legislature and not to be left subject to the whim of individual agencies to accept, allocate, or delegate. Respondents' suggestion that Forestry could delegate the duty of CEQA compliance as to only one limited aspect of the larger timber harvesting plan is even less persuasive. ■ CEQA embodies legislative determinations that single projects should not be subdivided, either by project component (cf. *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 283-284, and cognate cases) or (for reporting purposes) among multiple agencies (see our discussion, below, of the "lead agency concept").

■ Even were we inclined to accept the proposition that a CEQA reporting obligation might be delegated in whole or in part, we would conclude that no such delegation, either implicit or explicit, has been demonstrated in this case.

First, it is not true that Forestry lacked jurisdiction over the safety implications of log hauling. Forestry was obliged, under the analysis we have suggested in *Laupheimer, post,* to consider significant off-site environmental impacts. Coast's use of log trucks on Highway 17 was such an impact. Forestry unquestionably was empowered to disapprove the timber harvesting plan as a whole had it concluded that log hauling would create unacceptable levels of risk on Highway 17.

Respondents refer to Rules section 925.7, a provision of the "Santa Clara County Rules" (Rules §§ 925-925.11) adopted pursuant to Public Resources Code section 4516.5. Among other things these rules require that the timber harvesting plan as submitted show "all routes to be used for removing forest products from the plan area to the mill or county line" (Rules § 925.4, subd. (d)), and impose conditions and restrictions on activities *near* public roads (Rules §§ 925.8, 925.9, 925.11). Section 925.7 refers expressly to *use* of public roads. The section forbids log hauling on such roads on weekends and holidays, authorizes Forestry to restrict or forbid log hauling on such roads during commute hours or school busing hours, and allows Forestry to require the logger to post "special traffic signs and/or flagmen." Subdivision (d) of the rule provides that "[a]ny new access for the use of logging trucks to Highway 17 shall not be constructed until the [Forestry] Director has received approval for such construction

from [Caltrans] and has consulted with the County Transportation Agency. A request for newly constructed access must be accompanied by evidence that such access will not adversely impact traffic flow and safety on the highway." (Rules § 925.7, subd. (d).)

Respondents argue that the relatively narrow provisions of Rules section 925.7 operate to limit Forestry's power over traffic safety issues. We cannot agree. Forestry's power to disapprove a project as a whole necessarily implies a power to impose reasonable conditions upon approval of the project. Nothing in section 925.7 explicitly or implicitly limits Forestry's authority over all aspects of a timber harvesting plan: The section simply identifies issues of particular concern to the County. Of course it may be true, as Forestry acknowledged in this case, that a particular condition will require additional approvals beyond Forestry's jurisdiction, but this in no way limits Forestry's power to impose the condition so long as it is reasonable.

Nor, as we have discussed at some length, is Caltrans's power over matters of highway access and traffic safety nearly as broad as respondents have assumed.

Finally, we cannot read Forestry's major issue statement as an express delegation of reporting responsibility. The statement by no means amounts to a declaration that Forestry lacked jurisdiction to consider, and to grant or deny approval of the timber harvesting plan as a whole in light of, the potential risk to users of Highway 17. Obviously Forestry lacked jurisdiction to issue necessary encroachment permits or to enforce the rules of the road; its statement may reasonably be understood to say no more than this.

In sum, respondents' delegation theory is supported by neither the law, sound policy, nor the circumstances of record.

3. *Default.*

Respondents' second theory is a variant of CEQA's "lead agency concept," which provides for the situation in which more than one public agency might be required to prepare a negative declaration or EIR for a single project. CEQA's solution is to designate one of the agencies the "lead agency," which shall "consider[ ] the effects, both individual and collective, of all activities involved" in the project and shall be responsible for a single negative declaration or EIR, and to call the remaining agencies "responsible agencies" which shall consider "only the effects of those activities involved in a project, which it is required by law to carry out or approve" and shall consult with the lead agency, but shall not be required to prepare a negative declaration or an EIR. (Pub. Resources Code, §§ 21002.1, subd. (d), 21067,

21069, 21080, 21080.1, 21080.3-21080.4, 21165; Guidelines §§ 15050-15053.) The Guidelines provide for circumstances in which a responsible agency may be required to assume the lead agency's duties. (Guidelines § 15052.)

All agree that were the lead agency concept applicable to the Moody Gulch timber harvesting plan Forestry would be the lead agency. But as we have explained in *Laupheimer, post,* Forestry is exempt from the negative declaration and EIR requirements of CEQA by virtue of its valid and subsisting certification by the Secretary of the Resources Agency under Public Resources Code section 21080.5. Does the section 21080.5 exemption of what would otherwise be a lead agency extend to what would otherwise be responsible agencies as well? CEQA itself does not address the question; the Guidelines do:

"(a) An environmental analysis document prepared for a project under a certified program . . . shall be used by another agency granting an approval for the same project where the conditions in Subsection (b) have been met. In this situation, the certified agency shall act as lead agency, and the other permitting agencies shall act as responsible agencies using the certified agency's document.

"(b) The conditions under which a public agency shall act as a responsible agency when approving a project using an environmental analysis document prepared under a certified program in the place of an EIR or negative declaration are as follows:

"(1) The certified agency is the first agency to grant a discretionary approval for the project.

"(2) The certified agency consults with the responsible agencies, but the consultation need not include the exchange of written notices.

"(3) The environmental analysis document identifies:

"(A) The significant environmental effects within the jurisdiction or special expertise of the responsible agency.

"(B) Alternatives or mitigation measures that could avoid or reduce the severity of the significant environmental effects.

"(4) Where written notices were not exchanged in the consultation process, the responsible agency was afforded the opportunity to participate in the review of the property by the certified agency in a regular manner

designed to inform the certified agency of the concerns of the responsible agency before release of the EIR substitute for public review.

"(5) The certified agency established a consultation period between the certified agency and the responsible agency that was at least as long as the period allowed for public review of the EIR substitute document.

"(6) The certified agency exercised the powers of a lead agency by considering all the significant environmental effects of the project and making a finding under Section 15091 for each significant effect.

"(c) Certified agencies are not required to adjust their activities to meet the criteria in Subsection (b). Where a certified agency does not meet the criteria in Subsection (b):

"(1) The substitute document prepared by the agency shall not be used by other permitting agencies in the place of an EIR or negative declaration, and

"(2) Any other agencies granting approvals for the project shall comply with CEQA in the normal manner. A permitting agency shall act as a lead agency and prepare an EIR or a negative declaration. Other permitting agencies, if any, shall act as responsible agencies and use the EIR or negative declaration prepared by the lead agency." (Guidelines § 15253.)

Respondents argue that the timber harvesting plan as approved by Forestry did not meet the criteria of subdivision (b) of Guidelines section 15253, and therefore that Caltrans was compelled by virtue of subdivision (c) to prepare an EIR or a negative declaration.

We stress at the outset that respondents' argument invokes only subdivision (b) of section 15253, and cannot in this proceeding be construed as a broader challenge to the validity of Forestry's approval of Coast's timber harvesting plan under the Act and Rules (and under CEQA's "broad policy goals" and "substantive standards" in light of *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 620 [216 Cal.Rptr. 502] ["*EPIC*"]). Lexington Hills undertook the broader challenge in Moody Gulch II but did not pursue the broader challenge on appeal. Under the language of Guidelines section 15253 the question whether the timber harvesting plan was "adequate" or "inadequate," and thus whether Forestry should have approved or disapproved it, is not directly relevant to the considerably narrower question whether, for purposes of section 15253, the plan met the criteria of subdivision (b). The broader challenge is not properly before us in Moody Gulch III.

Similarly, Public Resources Code sections 21167.2 and 21167.3, cited by Caltrans in support of the proposition that any challenge to the timber harvesting plan should have been directed to Forestry rather than to Caltrans, are not relevant to the question whether the plan conformed to subdivision (b) of section 15253 of the Guidelines.

We conclude that subdivision (c) of Guidelines section 15253 does not in and of itself compel Caltrans to prepare an EIR or a negative declaration. Neither the lead agency concept nor its section 15253 variant extends the duty of environmental reporting to agencies to which the duty would not otherwise apply: Instead the concept is designed to obviate the need for redundant reports from agencies which *would* otherwise be obliged to report.

Because Guidelines section 15253 would not in any event have operated to impose a duty of CEQA compliance upon Caltrans, we need not reach Caltrans's contentions (1) that the provisions of subdivisions (b) and (c) of section 15253 have in necessary effect been voided by the First District's decision in *EPIC,* and (2) that in any event the timber harvesting plan as approved met the conditions of subdivision (b).

■ We conclude the encroachment permits were properly issued without CEQA compliance. We shall reverse the judgment in Moody Gulch III, with directions to enter judgment for Caltrans.

*Moody Gulch II*

■ Our conclusion in Moody Gulch III compels the further conclusion that the issues tendered in Moody Gulch II are moot: Caltrans has validly issued the encroachment permits and thus has satisfied the second of the two alternatives established by the judgment in Moody Gulch II. There is no further legal impediment to logging under the timber harvesting plan.

In Santa Clara County Superior Court action 535438, *Lexington Hills Association et al.* v. *State of California et al.* (our proceeding H000420), the judgment is affirmed. Respondents shall recover their costs on appeal.

In Santa Clara County Superior Court action 575614, *County of Santa Clara et al.* v. *Department of Transportation et al.* (our proceeding H000962), the judgment is reversed with directions to enter judgment for trial-court respondents California Department of Transportation, Burch C. Bachtold, and Robert L. Cashion, and for trial-court defendants Coast County Corporation, Advanced Investments, Inc., alias, Westar Timber Group No. 32, Ltd., Westar Timber Group No. 34, Ltd., and Timber

Harvest Management Company, Inc., with all trial-court costs. Appellants shall recover their costs on appeal.

In Santa Clara County Superior Court action 572429, *Lexington Hills Association et al.* v. *Soho et al.* (our proceeding H001172), the appeal is dismissed as moot. The trial court is directed to dissolve any existing injunction against logging activities which were the subject of timber harvesting plan 5-83-48 SCL and of this action. Each party shall bear its own costs on appeal.

Capaccioli, J., and Premo, J.,* concurred.

A petition for a rehearing was denied May 9, 1988, and appellants' petition in No. H000420 for review by the Supreme Court was denied June 29, 1988.

---

* Assigned by the Chairperson of the Judicial Council.