[No. H003297. Sixth Dist. July 18, 1988.]

LOREN McQUEEN, Plaintiff and Appellant, v.
BOARD OF DIRECTORS OF THE MID-PENINSULA
REGIONAL OPEN SPACE DISTRICT et al., Defendants and
Respondents.

1138

**COUNSEL**

Robert J. Logan for Plaintiff and Appellant.

Les A. Hausrath and Wendel, Lawlor, Rosen & Black for Defendants and Respondents.

**OPINION**

**AGLIANO, P. J.—**

1. *Introduction*

    California state government officials are required "to make decisions with environmental consequences in mind" by the California Environmen-

tal Quality Act (CEQA), Public Resources Code section 21000 et seq.[1] (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) Public agencies should give at least preliminary consideration to the possible environmental effects of any proposed activity which is not exempt from CEQA by statute or administrative regulation. (§§ 15002, subd. (k), 15061, subd. (a); Code, §§ 21080, subd. (c), 21100, 21151; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 240 [227 Cal.Rptr. 899].)

Loren McQueen (petitioner) challenges the decision of the Board of Directors of the Mid-Peninsula Regional Open Space District (the district) to file a notice of CEQA exemption for its activities described below. The issue is whether the district undertook a project within the meaning of CEQA and if so, its nature.

Petitioner appeals after the superior court essentially denied him relief on his petition for writ of mandate claiming the district's noncompliance with CEQA. We will reverse the trial court's order, require the district to engage in environmental review before implementing any plan for the acquired property, and remand for reconsideration of petitioner's request for attorney fees.

2. *Facts*

On January 26, 1983, the district authorized its general manager to begin negotiating the purchase of two parcels of surplus federal property which adjoined the district's Sierra Azul Open Space Preserve, namely a former Air Force station on Mount Umunhum and a ground air transmitter receiver site one mile east of the summit of Mount Thayer. The federal government vacated the property in 1980 and subsequently leased it for communications purposes. There are about 70 buildings on the property.

In April 1983, the district's general manager received an advisory memorandum asking who would be responsible for disposing of transformers on the property which were filled with polychlorinated biphenyls (PCB). He was asked whether the federal government's General Services Administration (GSA) planned to sell the district this waste disposal problem or clean it up first. The memo advised that under federal law if the PCB concentration was more than 50 parts per million, the fluid would have to be drained and incinerated. If the concentration was more than 500 parts per million,

---

[1] "Code section" refers to Public Resources Code sections. Unspecified section references are to the statewide administrative guidelines which implement CEQA. (14 Cal. Code Regs., § 15000 et seq.; formerly the Cal. Admin. Code.)

the transformer hull also would have to be specially disposed of. The memo also advised that there may be tougher state regulations.

At a meeting on August 10, 1983, the district approved a purchase offer. At a meeting on January 11, 1984, the district approved a revised offer. Adjoining property owners were notified of the proposed acquisition prior to these meetings. There is no evidence they were notified about the PCB problem. No one at that time raised environmental concerns.

Subsequent events occurred in 1986. The GSA accepted the district's revised offer on January 27. At a meeting on March 12, the district, at its land manager's recommendation, adopted a resolution reaffirming its purchase of the property and directing its managers to execute the necessary documents.

On March 12, the district also tentatively adopted an interim use and management plan proposed by its land manager which anticipated (1) a school's six-month study of the feasibility of using the existing buildings as a retreat and seminar facility, (2) a district staff study of no longer than eighteen months to produce a master plan for future use of the property, and (3) the district's final decision on future use after the studies and public hearings. Under the interim plan, pending final adoption of a master plan the district would continue existing communications facilities leases of the property, but the property would otherwise be withheld from dedication as public open space, be preserved by a caretaker, and remain closed to the public except for part of a road already in use.

Petitioner spoke at the March 12 meeting about problems with the water system on the property, but no other environmental concerns were raised. On the same date, district staff completed a checklist indicating that this activity was categorically exempt from CEQA on several grounds.

On March 19, Colonel Hodge, an Air Force civil engineer, notified the GSA about the existence of hazardous waste materials on the former Air Force station, namely transformers containing PCB, buried fuel tanks, and drums containing solvents and other chemicals. Hodge suggested "the sale of properties containing hazardous materials and unabandoned [*sic*] storage tanks may be illegal." He proposed postponing closure of the sale pending investigation of the need for cleanup action. On March 21, the GSA agreed with the district to extend the close of escrow until April 30 in order "to resolve the environmental concerns which have recently arisen."

At the district's meeting on April 16, petitioner's counsel read Hodge's letter aloud and questioned whether the district could acquire the property

without an environmental clearance. A district staff member responded that acquisition of open space was categorically exempt. Another district staff member explained that the federal government would be dealing with removal of the underground tanks. At this meeting, the district finally adopted the interim use and management plan at its general manager's recommendation. The written interim plan does not provide for storing, using, or disposing of the toxic, hazardous substances on the property.

On April 18, the district's land manager proposed to the GSA that escrow close as planned and that the federal government would subsequently investigate the possibility of toxic or hazardous materials on the property and take care of any necessary removal or containment. On April 21, the district entered a supplemental agreement with the GSA, accepting the former Air Force station and allowing the federal government "access to the site to conduct an investigation and such decontamination as may be required."

Also on April 21, petitioner's counsel addressed a letter to the district challenging its assertion that the property acquisition was categorically exempt from CEQA. The district acquired the property by a deed recorded April 24. On April 25, the district filed a notice of CEQA exemption for a project described as "[a]cquisition for public open space" of surplus "Federal property on Mts. Umunhum and Thayer" which asserts three grounds, discussed below (p. 1148), for categorical exemption.

Petitioner filed this lawsuit on May 27 seeking to restrain the district from acquiring the property and implementing any plan for its use until the district conducted an adequate environmental review. The district responded on November 17 with affidavits by its land manager and its real property representative asserting the following. The toxic and hazardous substances are located on the improved part of the property. In this area are a number of electrical transformers which probably contain PCB, a number of containers of chemicals, solvents, and other petroleum products, and underground oil and gasoline tanks which have probably been pumped dry. None seems to be leaking. The GSA had promised before escrow closed that the federal government would take full responsibility for removing the substances and decontaminating the property. Its first step was an inspection of the property on October 8 by the United States Corps of Engineers. The removal would be completed in two years, while the district was studying its final plan for use of the property.

At a court hearing on November 21, the district took the position that environmental review would not be appropriate until the district was considering its final plan. Its counsel asserted, "We don't feel that if you buy a

piece of property or acquire a piece of property that happens to contain allegedly potential toxics that that triggers CEQA. There isn't anything to investigate or inquire about at this time. There is going to be a process of disposal taking care of that. The federal government admitted responsibility for that."

When questioned by the court about this proposed removal, the district's counsel replied that it was not an activity of the district and it was only speculative so far. He conceded that if removal was decided on, at that time environmental review might be appropriate.

By order filed December 8 the court denied petitioner relief except for ordering the district to provide a status report within 30 days on the investigation of the former Air Force station for toxic contaminants and any proposals for decontamination. The court reserved jurisdiction to make further orders about decontamination and attorney fees and costs. The district filed a status report on January 8, 1987. After a hearing on May 1, 1987, the court denied petitioner's request for attorney fees in a statement of decision filed May 8.

3. *Description of the Project*

Petitioner contends the district employed an incomplete and misleading description of the project in determining it was exempt from CEQA.

An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity. (Cf. *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396].) CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies . . . ." (Code, § 21080.) A project is any activity "directly undertaken by any public agency" or by a person or other public entity assisted or approved by a public agency. (Code, §§ 21065, 21066.) A project is "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ," including "the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (§ 15378, subds. (a), (c).)

"Project" is given a broad interpretation in order to maximize protection of the environment. (*Shawn* v. *Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699, 701 [131 Cal.Rptr. 867]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893]; cf. *Bozung, supra,* 13 Cal.3d 263, 278-281; *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d

779, 795-797 [187 Cal.Rptr. 398, 654 P.2d 168]; *City of Carmel-by-the-Sea, supra,* 183 Cal.App.3d 229, 241-244; §§ 15003, subd. (f), 15378, subd. (d).) A narrow view of a project could result in the fallacy of division (Engel, With Good Reason (3d ed. 1986) pp. 113-115), that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole. (Cf. *Bozung, supra,* pp. 283-284; *City of Carmel-by-the-Sea, supra,* p. 243; *Lexington Hills Assn.* v. *State of California* (1988) 200 Cal.App.3d 415, 430 [246 Cal.Rptr. 97], and cases there cited.)

■ The district's notice of CEQA exemption simply described the project as the acquisition of named surplus federal property for public open space. (§ 15062, subd. (a)(1).) At the time this notice of exemption was filed, the district had approved not only acquisition of the property, but also a plan for interim use and management. On appeal, the district contends that the project it approved "included: (i) the acquisition of the surplus Federal Government property, with the existing hazardous contaminants; and (ii) the adoption of the Interim Use and Management Plan, including the authorization to execute interim communication facilities leases with existing users and to undertake a feasibility study for possible uses of the site." Petitioner contends that the project also includes the supplemental agreement's grant of access to the federal government to decontaminate the property, which was executed four days before the notice of exemption was filed.

Petitioner does not dispute the district's contention that Code section 21168.5, and not Code section 21168, provides the standard for judicial review. (Cf. *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835-836 [171 Cal.Rptr. 753].) Where the public agency was not required by law to hold an evidentiary hearing (see Code, § 5547), the trial court's concern is whether the agency prejudicially abused its discretion, either by not proceeding in a manner required by law or by making a decision not supported by substantial evidence. "The court reviews the decision in a traditional mandamus action, a proceeding in which the court's inquiry is not limited to the administrative record, but in which it may receive additional evidence. [Fn. omitted.]" (*Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1112 [232 Cal.Rptr. 359]; cf. *No Oil, Inc., supra,* 13 Cal.3d 68, 74-75, 79, fns. 3, 6.)

On appeal, we resolve factual conflicts in favor of those express or implicit findings by the trial court which are supported by substantial evidence. (*Dehne, supra,* 115 Cal.App.3d 827, 844-845, and cases there cited; *City of South Gate* v. *Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1422 [229 Cal.Rptr. 568].) We do not undertake a substantial evidence review if the facts are undisputed and the issue is the description of a

project. (Cf. *Fullerton Joint Union High School Dist., supra,* 32 Cal.3d 779, 794-795; *City of South Gate, supra,* p. 1422.)

There is no factual dispute that the project includes, at least, the acquisition of property containing toxic and hazardous substances. There is undisputed evidence that the district's general manager was apprised in 1983 while negotiating for the property's purchase that it contained transformers with PCB.

Some explanation of the legal significance of PCB is in order. When Congress enacted the Toxic Substances Control Act in 1976, it singled out one substance for regulation, namely PCB. (15 U.S.C. § 2605(e).) PCB is a known carcinogen, dangerous to humans and animals. (*Env. Def. Fund, Inc.* v. *Env. Prot. Agency* (1980) 205 App. D.C.139 [636 F.2d 1267, 1270-1271].) Designation of other toxic substances was delegated to the Administrator of the Environmental Protection Agency. By 1979, the administrator had adopted regulations governing the storage, use, and disposal of PCB, which required disposal of any PCB article or container within one year from its storage. (44 Fed. Reg. 31542 (May 31, 1979).) It was these regulations which were paraphrased to the district's general manager in the April 1983 memo.

California undertook to regulate hazardous wastes in 1972. (Stats. 1972, ch. 1236, § 1, p. 2388 et seq.) The state Department of Health Services was authorized to identify wastes determined to be hazardous and extremely hazardous and to promulgate regulations for the handling, storage, and disposal of such wastes. (Health & Saf. Code, §§ 25140, 25141, 25154, 25155.) PCB was identified as an extremely hazardous waste in 1979 (former Cal. Admin. Code, tit. 22, § 66680, subd. (d)(606)), which had to be handled in accordance with methods approved by the department and a permit issued by it (former Cal. Admin. Code, tit. 22, § 66570).[2]

Thus, at the time the district proposed to acquire this property containing PCB, federal and state regulations were premised on the extreme environmental danger of improper storage, use, and disposal of PCB. The question arises whether CEQA allows the district to describe its project so as to put off consideration of the environmental hazard posed by the district's acquisition and use of the property.

---

[2]In 1985, liquids containing PCB concentrations of 50 milligrams per liter were statutorily identified as a restricted hazardous waste. (Health & Saf. Code, § 25122.7, subd. (a)(4); Stats. 1984, ch. 1543, § 1, p. 5444.)

We need not resolve which set of regulations, either federal or state, applied. (See *People* v. *Todd Shipyards Corp.* (1987) 192 Cal.App.3d Supp. 20, 33-39 [238 Cal.Rptr. 761]; Annot. (1987) 84 A.L.R.Fed. 913.)

The district's position is essentially that it has only acquired the property on speculation with no definite plans for either the property generally or toxic, hazardous substances specifically. We are aware of no exception allowing a governmental agency to avoid consideration of and compliance with PCB regulations until after purchase and pending a final decision on use of property containing PCB. At the very least the district itself began storing PCB when it acquired the property, whether or not it had any plan to use or remove it. The district could not knowingly acquire property containing PCB without simultaneously assuming the grave responsibility to store, use, or dispose of it legally.

In fact, the district does appear to have some plan, unstated in the written interim plan, for disposing of PCB and other hazardous substances. When petitioner raised this environmental concern at the district's board meeting prior to final approval of the interim plan, a district staff member explained that the federal government would be responsible for removing underground tanks. The district's land acquisition manager subsequently executed an agreement supplemental to the acquisition by which the district granted the federal government "access . . . to conduct . . . such decontamination as may be required."

The district takes the position that the supplemental agreement is not part of the project because its board did not authorize or approve it. The district, however, has relied upon and ratified the agreement.

It appears, as petitioner contends, that the district has impermissibly divided the project into segments which evade CEQA review. (*Bozung, supra,* 13 Cal.3d 263, 283-284; *Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d 151, 165; *City of Carmel-by-the-Sea, supra,* 183 Cal.App.3d 229, 243.) Not only did the district in fact begin making plans for disposal of PCB and other hazardous waste before acquiring the property, but it could not legally do otherwise upon acquiring property which it knew contained PCB. ■ CEQA requires consideration of the potential environmental effects of the project actually approved by the public agency, not some hypothetical project. (Cf. *County of Inyo, supra,* 71 Cal.App.3d 185, 199; *City of San Jose* v. *Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1017 [237 Cal.Rptr. 845].)

The district also contends it would have been premature to begin planning for PCB storage, use, or removal when it acquired the property. ■ "The timing of an environmental study can present a delicate problem. ' "Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into

the decision making process." ' (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 77 fn. 5 . . . .)" (*Fullerton Joint Union High School Dist., supra,* 32 Cal.3d 779, 797.) California law requires environmental consideration be given at the earliest possible stage, even though more detailed environmental review may be necessary later. (*Ibid.; Bozung, supra,* 13 Cal.3d 263, 282.) Section 15004, subdivision (b)(1), states in part, "CEQA compliance should be completed prior to acquisition of a site for a public project." Since the district was immediately obliged to properly store, use, or dispose of PCB upon acquiring this property, it should have given some attention in preliminary planning to the potential environmental consequences of this activity.

The trial court's requirement of a decontamination status report after the district's acquisition of the property does not remedy the omission of appropriate preacquisition consideration of environmental consequences. (*No Oil, Inc., supra,* 13 Cal.3d 68, 81; *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 899-900 [236 Cal.Rptr. 794].)

The district does not cite nor are we aware of any CEQA provision allowing delegation of responsibility for environmental concerns to a former property owner, even if the former owner was the federal government. Since the federal government's decontamination of the district's property depends on obtaining the district's permission, the district would appear to be the lead agency for CEQA purposes. (§ 15051; Code, §§ 21002.1, subd. (d), 21067, 21165; *Lexington Hills Assn., supra,* 200 Cal.App.3d 415, 435-438.)

■ We conclude that the district's project was not simply acquisition of improved realty, but its maintenance which included storage, if not use or disposal, of PCB and other hazardous wastes thereon. We need not consider the district's supplemental agreement to be part of this project to further conclude that this project is an activity with the potential for ultimately changing the environment. Federal and state regulations require the district to store, use, or dispose of PCB and other hazardous wastes in particular ways in order to minimize environmental danger.

4. *Categorical Exemptions*

■ The next question is whether such a project is categorically exempt from CEQA. The Secretary of the Resources Agency is authorized to exempt certain categories of projects which do not have a significant effect on the environment. (Code, § 21084.) The district determined in its notice of exemption that this project fit three categorical exemptions. The record does not support the district's contention that petitioner failed to challenge these exemptions in the trial court.

Our concern is whether there is substantial evidence supporting the district's assertion of exemption. (*Western Mun. Water Dist., supra,* 187 Cal.App.3d 1104, 1113.) All three exemptions identified in the notice of exemption can be ruled out. A "Class 25" project "consists of the transfers of ownership of interests in land in order to preserve open space. Examples include but are not limited to: [¶] . . . (c) Acquisition to allow restoration of natural conditions. . . ." (§ 15325.) Open space land is land "which is essentially unimproved . . . ." (Gov. Code, § 51075, subd. (a).) The interim plan calls for preserving the property as improved and possible use of the existing 70 buildings for a school's retreat. Such a use does not qualify as open space or a return to natural conditions. ■ Exemption categories should not be unreasonably expanded beyond their terms. (*Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413, 425 [129 Cal.Rptr. 902]; see *Dehne, supra,* 115 Cal.App.3d 827, 842.)

A "Class 16" project "consists of the acquisition or sale of land in order to establish a park where the land is in a natural condition or contains historic sites or archaelogical sites and . . . : [¶] (a) The management plan for the park has not been prepared . . . ." (§ 15316.) ■ There is no substantial evidence in the record that the land is in a natural condition or contains historic or archaeological sites.

A "Class 12" project "consists of sales of surplus government property . . . ." (§ 15312.) Petitioner contends this project involves much more than a sale of property. Actually, it does not involve a sale by the relevant public agency at all. It involves an acquisition. Sections 15312, 15316 and 15325 of the administrative regulations referred to above illustrate that the terms "sale" and "acquisition" are not interchangeable and that whether the responsible agency is exempt from CEQA compliance depends on whether it is disposing of or acquiring the property in conjunction with the nature and purpose of the transfer. Thus, an "acquisition" to allow restoration of natural conditions is exempt under section 15325, subdivision (c); and either "acquisition" or "sale" of land in order to establish a park may qualify for exemption under section 15316. In contrast, the exemption here in issue specifically applies to "sales" of surplus government property indicating, in context, that acquisition of such property is not exempt under this provision. If the Secretary of the Resources Agency had intended to exempt acquisitions of surplus government property as well as sales, the categorical exemptions would say so. (Cf. *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195-196 [132 Cal.Rptr. 377, 553 P.2d 537].)

Petitioner correctly contends that these categorical exemptions should not have been employed for the additional reason that "[a] categorical exemption shall not be used for an activity where there is a reasonable

possibility that the activity will have a significant effect on the environment due to unusual circumstances." (§ 15300.2, subd. (c).) We conclude for the reasons stated above and below that the known existence of PCB and other hazardous wastes on property to be acquired is an unusual circumstance threatening the environment. For this reason, we need not pursue the district's suggestion on appeal that the project was categorically exempt as involving the operation of existing facilities. (§ 15301.)

While the notice of exemption did not assert that the project was exempt from CEQA because "it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (§ 15061, subd. (b)(3)), the district has so contended in the trial court and on appeal. The district invokes the definition that a " '[s]ignificant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project . . . ." (§ 15382; cf. Code, §§ 21100, 21151.) The district contends that mere acquisition of the property did not cause a physical change.

Similar contentions have been repeatedly rejected. A project "may have a significant effect on the environment" (Code, § 21151) if it may ultimately culminate in physical change to the environment. (*Bozung, supra,* 13 Cal.3d 263, 281—approval of annexation to facilitate development of agricultural land; *City of Carmel-by-the-Sea, supra,* 183 Cal.App.3d 229, 245-247—rezoning of wetlands to facilitate development.) In light of the federal and state regulations of PCB, it is too late for the district to assert there is no possibility that the storage, use, or disposal of PCB may only eventually cause an adverse change in the physical conditions of the affected area.

The district also suggests that this project is statutorily exempt as involving "only feasibility or planning studies for possible future actions which the agency . . . has not approved, adopted or funded . . . ." (Code, §§ 21102, 21150; § 15262.) This exemption does not apply because the district has not simply approved feasibility and planning studies, but has also acquired property and the concomitant obligation to properly store, use, or dispose of the hazardous waste on it.

Since there was no basis for the district's determination that this project, accurately described, was exempt from CEQA, we conclude the district abused its discretion by not proceeding in a manner required by law. (Cf. *No Oil, Inc., supra,* 13 Cal.3d 68, 81.)

## 5. *Exhaustion of Administrative Remedies*

■ The district contends that the courts should not entertain petitioner's contentions because he failed to exhaust his administrative remedies.[3] This requirement of exhaustion has been applied to claims of inadequacy of environmental impact reports (EIR's) (*Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 417-419 [194 Cal.Rptr. 357, 668 P.2d 664]; *Resource Defense Fund, supra,* 191 Cal.App.3d 886, 894), and negative declarations (*Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197-1198 [200 Cal.Rptr. 855]; *California Aviation Council* v. *County of Amador* (1988) 200 Cal.App.3d 337, 345 [246 Cal.Rptr. 110]).

The Legislature attempted to codify the case law in Code section 21177 (200 Cal.App.3d at p. 343), which provides in pertinent part: "(a) No action may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person. [¶] (b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing. . . . [¶] (e) This section does not apply when there was no public hearing or other opportunity for members of the public to raise objections prior to the approval of the project or when the public agency failed to give the notice required by law."

The district contends that petitioner should have raised environmental concerns sooner at its hearings concerning the acquisition than he did.

As Code section 21177, subdivision (e), indicates, exhaustion of administrative remedies has not been required of CEQA petitioners who did not receive proper notice of administrative hearings. (*Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 113-114 [122 Cal.Rptr. 282], as discussed in *Sea & Sage Audubon Society, Inc., supra,* 34 Cal.3d 412, 417-418; accord, *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 611 [156 Cal.Rptr. 718, 596 P.2d 1134]; *Plaggmier* v. *City of San Jose* (1980) 101 Cal.App.3d 842, 851, 857 [161 Cal.Rptr. 886].) We consider petitioner's situation tantamount to a lack of notice due to the incomplete and misleading project description employed by the district. While there is evidence the district gave notice of the proposed property acquisition, there is no evidence that the notice mentioned the acquisition of toxic, hazardous substances.

---

[3] In this connection, the district persists in citing *Gorsuch* v. *City of Sonora* (Cal.App.), although petitioner pointed out in the trial court that this decision has been depublished. (Cal.Rules of Court, rule 977.)

The district asserts in another context, "the District Board was not required by law to conduct a hearing on petitioner's objection to the granting of the categorical exemption at issue herein." Though CEQA does not require formal public hearings (§ 15202, subd. (a)), "[i]f an agency provides a public hearing on its decision to carry out or approve a project, the agency should include environmental review as one of the subjects for the hearing." (§ 15202, subd. (b).) There is no evidence that the district considered the PCB problem at any hearing except when petitioner raised it.

To apply the exhaustion requirement under these circumstances would stand CEQA on its head and encourage a public agency to leave environmental concerns out of its announced plans. It would require the public to ferret out the true nature of the public agency's project and its possible environmental consequences. However, public reaction to a proposed project is no substitute for adequate consideration of environmental concerns by the lead public agency. (§ 15020.)

In *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852 [226 Cal.Rptr. 575], we determined that a CEQA petitioner had adequately exhausted its administrative remedies when it questioned aspects of a proposed EIR in a letter submitted to the lead agency before it gave final approval to the EIR. (Cf. *Horn, supra,* 24 Cal.3d 605, 611-612.)

Considering the manner in which the district's proposed plans for acquisition were publicized, we conclude petitioner adequately raised the objections available at the time. (Compare *Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d 151, 163, with *Coalition for Student Action, supra,* 153 Cal.App.3d 1194, 1197-1198.) Petitioner questioned the district about Hodge's letter at its next meeting. When he was informed the project was categorically exempt, he wrote a letter challenging that determination. Once the district filed a notice of exemption, it was prudent for petitioner to quickly file this lawsuit. The filing of a notice of exemption triggered a 35-day limitations period "on legal challenges to the agency's decision that the project is exempt from CEQA." (§ 15062, subd. (d).) We conclude he adequately exhausted the limited administrative remedies available.

6. *Request for Attorney Fees*

After the trial court denied petitioner relief except for ordering a status report and retaining jurisdiction over decontamination of the district's property, petitioner made a motion for attorney fees pursuant to Code of Civil Procedure section 1021.5, which provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing

parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

The trial court denied petitioner's request for attorney fees due to the limited relief it awarded and the consequent limited public benefit conferred. The trial court concluded that petitioner's " 'success' herein is simply too limited to justify an award of attorney's fees under 1021.5."

Typically, where a CEQA petitioner has obtained greater relief on appeal than in the trial court, the appellate court has remanded the matter to the trial court for reconsideration of its ruling on a request for attorney fees pursuant to Code of Civil Procedure section 1021.5. (*Starbird* v. *County of San Benito* (1981) 122 Cal.App.3d 657, 665 [176 Cal.Rptr. 149]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 706 [188 Cal.Rptr. 233]; *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 601 [197 Cal.Rptr. 303]; *Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d 151, 176-177; *Laupheimer* v. *State of California* (1988) 200 Cal.App.3d 440, 467 [246 Cal.Rptr. 82].) We need provide no further guidance for the trial court's reconsideration of petitioner's request for attorney fees in light of the existence of ample CEQA precedent.

7. *Disposition*

Petitioner does not seek to vacate the district's acquisition of the subject property. He has requested that the district be enjoined from implementing the existing interim use and management plan and be mandated to conduct a proper environmental review of the project as described above in part 3. Such relief is appropriate under the circumstances. (Cf. *Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d 151, 167-168, 177; *Resource Defense Fund, supra,* 191 Cal.App.3d 886, 897-900.)

The judgment is reversed and the matter is remanded to the trial court with directions to issue a writ of mandate enjoining the district from implementing any interim plan and ordering the district to reconsider its determination of exemption in light of this opinion and to comply with the law. The

trial court shall also reconsider petitioner's request for attorney fees. Petitioner to recover costs, including attorney fees, on appeal.

Brauer, J., and Chapman, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied October 26, 1988.

---

*Assigned by the Chairperson of the Judicial Council.