[No. E012898. Fourth Dist., Div. Two. Mar. 8, 1996.]

TEMECULA BAND OF LUISEÑO MISSION INDIANS, Plaintiff and Appellant, v.
RANCHO CALIFORNIA WATER DISTRICT, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V, VI, VII, IX and X.

**COUNSEL**

Fleishman, Fisher & Moest, Barry A. Fisher, Levine & Associates and Jerome L. Levine for Plaintiff and Appellant.

Best, Best & Krieger, C. Michael Cowett and Dearing D. English for Defendant and Respondent.

**OPINION**

**RICHLI, J.—**

## I.

### INTRODUCTION

In 1984, defendant Rancho California Water District (the District) conceived a program of pumping and using local groundwater, then recharging the groundwater with rainwater and "imported" (i.e., purchased) water. To comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] the District performed an environmental review of the program, and concluded that it would have no significant effect on the environment. Accordingly, the District adopted a negative declaration.

---

[1] All further statutory citations are to the Public Resources Code, unless otherwise specified.

By 1989, the District had completed some of the construction necessary for the program. It decided to begin construction of Pipeline A, which was intended to bring imported water to a recharge area and release it there, to percolate into the groundwater. However, the District also decided to reroute and redesign Pipeline A. To comply with CEQA, the District performed an environmental review of this new project, concluded that it would have no significant effect on the environment, and adopted a second negative declaration.

This time, however, it did so over the opposition of the Temecula Band of Luiseño Mission Indians (the Luiseños). The Luiseños live on the Pechanga Indian Reservation, not far from the recharge area. They are concerned about possible effects on the availability and quality of the groundwater which is the source of their drinking water. In this appeal, they contend that the District improperly adopted the second negative declaration because:

1.  The District's notice of intent to adopt a negative declaration did not provide a sufficient public review period.

2.  The District's initial study did not identify any reports, studies, or other information supporting its conclusions.

3.  The District's description of the project was inaccurate because it failed to mention either the original program, or a related plan for blending imported water with wastewater.

4.  There was substantial evidence that the project could have significant cumulative effects when considered either with the original program, or with the related plan for blending imported water with wastewater.

5.  There was substantial evidence that the project could have significant environmental effects above and beyond the effects of the original program.

We reject these contentions, and we will affirm.

## II.

### FACTUAL BACKGROUND

The District is a local public agency organized under the California Water District Law (Wat. Code, § 34000 et seq.). It supplies water to a 95,000-acre area around Rancho California and Temecula in Riverside County. The District gets most of its water from local sources, including groundwater and

Vail Lake. It gets the rest by purchasing water from Lake Skinner, which is owned by the Metropolitan Water District (MWD).

In 1984, the District proposed the Supplemental Water Supply Program (1984 Program). The essence of the 1984 Program was the use of the local groundwater basin as "an active operating storage reservoir." First, the District would pump out and use groundwater. This would reduce the District's need to purchase imported water, which was relatively expensive, and the continued availability of which was uncertain. The pumping also would create underground storage capacity, which the District could use to store storm runoff that would otherwise drain away. Moreover, the District could purchase imported water at off-peak rates and store it underground until needed. Thus, the 1984 Program would maximize the District's ability to manage its water resources, stabilize water costs, and decrease the District's reliance on imported water.

The 1984 Program entailed construction of approximately 38 wells, 2 pump stations, 24 miles of pipeline, and a 187-acre recharge area (or spreading ground) at Valle de los Caballos in the Pauba Valley. The wells served to draw out groundwater, lowering the groundwater level by as much as 200 feet. Pipeline B would distribute the groundwater to existing District service areas. Pipeline A (also known as "Transmission Main A" or the "VDC Main") would bring raw imported water from Lake Skinner to the Valle de los Caballos recharge area, where it would be released to percolate into the groundwater basin. Pipeline C would run between Valle de los Caballos and Vail Lake; although the record is not entirely clear, it appears that Pipeline C could operate in both directions, taking Lake Skinner water imported by Pipeline A on to Vail Lake, and bringing storm water collected in Vail Lake to Valle de los Caballos. Most but not all of the pipelines would run in existing rights-of-way.

The District planned to finance the 1984 Program with a loan of over $20 million from the federal Bureau of Reclamation (Bureau loan). The 1984 Program was therefore subject not only to CEQA, but also to the National Environmental Policy Act (NEPA). (42 U.S.C. § 4321 et seq.) The District accordingly prepared an environmental assessment on the 1984 Program. On or about August 31, 1984, the District adopted a negative declaration under CEQA for the 1984 Program; on September 12, 1984, it filed a notice of determination.[2] On September 24, 1984, the Bureau of Reclamation adopted

[2]The District states that the Luiseños "first challenged the [1984] Program in 1984." The District also tries to suggest that the Luiseños participated in public hearings on the 1984

a finding of no significant impact (FONSI) for the 1984 Program under NEPA.[3]

We find no approval of the 1984 Program, as such, in the administrative record. However, on June 21, 1985, the District authorized execution of the loan agreement with the Bureau of Reclamation. Meanwhile, although the Bureau loan had not yet funded, the District began constructing some of the wells provided for in the 1984 Program. Around July 1986, the District received its first advance under the Bureau loan. In 1988 or 1989, however, the District "bought out," or prepaid, the Bureau loan (evidently at a substantial discount). This meant it had no funds to proceed with the 1984 Program.

In 1989, the District proposed rerouting and redesigning Pipeline A, and commencing construction of one portion of it at its own expense (the Project). The new route was 6,200 feet shorter; it would be entirely within existing rights-of-way. The redesign increased the diameter of Pipeline A from 30 inches to 48 inches. By decreasing "head loss"—loss of hydraulic

---

Program. *In 1986*, the District held an election so property owners could vote on approval of the Bureau loan. *In connection with that election*, the Luiseños wrote to the District opposing the 1984 Program. Also in connection with that election, they were listed in newspaper articles as being opposed, and Luiseño representatives expressed opposition in a radio interview. However, there is no evidence that *when the negative declaration was adopted*, the Luiseños were even aware of the 1984 Program, much less that they participated in public hearings concerning it or challenged it.

[3]Although the administrative record is confusing and perhaps incomplete, it raises serious questions about the District's adoption of a negative declaration for the 1984 Program.

The record contains a "Notice of Preparation of a Negative Declaration" dated August 9, 1984, but there is no indication that this notice was ever given to the public. On August 13, 1984, the District gave notice that a public hearing on the proposed negative declaration had been continued from August 8 to September 5, 1984. However, the negative declaration itself is dated August 31, 1984. In the trial court, the District conceded that the negative declaration was "issued" on August 31, 1984. The District now claims that it adopted the negative declaration on October 31, 1984; however, there is no support in the record for this date. Finally, although we have at least partial board meeting minutes for this period, there is no record of the board ever actually adopting the proposed negative declaration.

The District, evidently sensible to these issues, argues, citing section 21083.5, that the FONSI "satisfie[d] CEQA's environmental documentation requirements." Section 21083.5 provides that a lead agency may submit a NEPA environmental impact statement (EIS) in lieu of an environmental impact report (EIR), provided the EIS complies with CEQA. Assuming that this authorized use of a FONSI in lieu of a negative declaration, as the Guidelines subsequently permitted (Cal.Code Regs., tit. 14, § 15221, subd. (A) (hereafter Guidelines)), here the FONSI was not issued until September 24, 1984, *after* the District's negative declaration and notice of determination. (See Guidelines, § 15221, subd. (a)(1).) Also, it is far from clear that the FONSI complied with CEQA.

We need not determine, however, whether the 1984 negative declaration was valid, because any challenge to it is barred by the statute of limitations. (§ 21167, subds. (b), (e).)

pressure in transit—this would eliminate the need for one pump station. The Project was intended to lower costs and to bypass certain "sensitive habitat areas."[4]

To comply with CEQA, the District prepared an initial study on the project. The initial study was in checklist form. It gave brief narrative explanations for many of its conclusions; however, it did not cite any studies, reports, or other information sources. It found that the project would have no significant effect on the environment. Accordingly, it recommended adoption of a negative declaration.

On December 27, 1989, the District gave notice of its intent to adopt a negative declaration for the Project. It posted the notice in the lobby of the District's offices and in the United States Post Office in Temecula. The notice required comments to be submitted by January 12, 1990.

The Luiseños occupy the Pechanga Indian Reservation in Wolf Valley, just south of Valle de los Caballos. They obtain their drinking water from wells. The Luiseños contend that the groundwater underlying their reservation may be hydrologically linked with the groundwater underlying the Valle de los Caballos recharge area.

On January 12, 1990, the District held a public hearing. Luiseño representatives attended the public hearing and submitted both oral and written comments opposing adoption of the negative declaration. At the end of the hearing, however, the District adopted the negative declaration.

Meanwhile, the District was also considering ways to increase its wastewater disposal capacity. Consultants to the District recommended blending wastewater with raw imported water (Wastewater Blending Proposal). The Wastewater Blending Proposal was dependent on Pipeline A to supply the necessary imported water. The Wastewater Blending Proposal, however, was

---

[4]The District tells us it rerouted Pipeline A because the price of imported water had fallen, and because "the county changed its right-of-ways, . . . enabling the District to place [Pipeline A] completely within existing or planned roadways." This is not entirely consistent with the record.

The fall in the price of imported water made immediate construction of the pipeline desirable, but would not have been a factor in the rerouting. Similarly, the fact that a local assessment district was about to build (not "change") a previously undeveloped portion of De Portola Road made it advantageous to begin laying the pipeline at the same time. However, the decision to reroute the pipeline along De Portola Road seems to have been made earlier; the record does not clearly indicate that the road improvement project influenced it.

only one of several wastewater disposal scenarios the District was considering. At the same public hearing on January 12, 1990, there was a presentation on the Wastewater Blending Proposal, and the board gave it "conceptual approval."

## III.

### PROCEDURAL BACKGROUND

On February 15, 1990, the Luiseños filed a petition for writ of mandate and complaint for injunctive and declaratory relief. On April 2, 1990, the District filed its answer.

On August 2, 1990, the Luiseños filed a memorandum of points and authorities, four declarations, and a request for judicial notice in support of their petition. They also filed a motion for a preliminary injunction which was set for hearing at the same time as the hearing on their petition. On August 10, 1990, the District filed memoranda of points and authorities, one declaration, and a request for judicial notice in opposition. The District also moved to strike three of the Luiseños' four declarations, and their request for judicial notice.

After a hearing on September 7, 1990, the trial court took the matter under submission. On September 18, 1990, it issued an intended statement of decision, to which the Luiseños filed written objections. On November 19, 1990, the trial court issued its final statement of decision. The trial court denied the petition and the motion for preliminary injunction. It also declined to consider the "additional documentary evidence" submitted by the Luiseños. On December 20, 1990, the trial court entered a judgment in favor of the District.

On February 15, 1991, both the Luiseños and the District filed notices of appeal from the judgment (*Temecula Band of Luiseño Mission Indians* v. *Rancho Cal. Water Dist.* (July 23, 1992) E009148 [nonpub. opn.]). On July 23, 1992, after the appellate record had been filed and the appeal fully briefed, we issued an opinion dismissing the appeal. We held that to the extent that the Luiseños' appeal was taken from the denial of a preliminary injunction, it was moot because the Luiseños moved to enjoin only construction of the Project, and the Project was substantially complete. To the extent that the appeal was taken from the purported judgment, the judgment was not final because the trial court had not adjudicated the Luiseños' declaratory relief cause of action. We also held that the District was not aggrieved and lacked standing to appeal.

The District then filed a motion for judgment on the pleadings. The Luiseños did not oppose the motion. On April 6, 1993, the trial court entered judgment in favor of the District. On June 2, 1993, the Luiseños filed a timely notice of appeal.

IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

VIII.

COMBINED EFFECTS OF THE PROJECT AND THE 1984 PROGRAM

The Luiseños contend that the project description was inaccurate and misleading because it failed to mention the 1984 Program. They also contend that the District ignored "cumulative effects" of the Project and the 1984 Program, and that there was substantial evidence to support a fair argument that such cumulative effects—allegedly including the lowering of the groundwater level by up to 200 feet and the impairment of groundwater quality—were significant.

A. *Accuracy of the Project Description.*

■ The District contends that the Luiseños failed to exhaust their administrative remedies regarding inaccuracy of the project description. As noted in an unpublished portion of this opinion, exhaustion is not required where the public agency has failed to give the notice required by law. A proposed negative declaration must briefly describe the project (Guidelines, § 15071, subd. (a)) and must attach a copy of the initial study, which also must describe the project. (Guidelines, §§ 15063, subd. (d)(1), 15071, subd. (d).) The Luiseños contend, citing *McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136 [249 Cal.Rptr. 439], that if the project description is inaccurate or misleading, the notice required by law has not been given.

In *McQueen*, a local district proposed purchasing certain land. The district knew the land was contaminated by polychlorinated biphenyls (PCB), but did not make that fact publicly known. (202 Cal.App.3d at pp. 1140-1141.) At a March 12 public hearing, petitioner McQueen appeared and spoke regarding the project; however, he raised no concerns about contamination. The district approved the purchase, and tentatively adopted an interim use and management plan for the land. (*Id.,* at p. 1141.) Thereafter, one Hodge

*See footnote, *ante*, page 425.

wrote a letter revealing the PCB contamination. At an April 16 public hearing, McQueen's counsel appeared and raised the contamination issue. (*Id.,* at pp. 1141-1142.) The district, however, taking the position that the project was exempt from CEQA, finally adopted the use and management plan. McQueen's counsel also wrote a letter to the district challenging its claim of exemption. Nevertheless, the district went ahead with the purchase. (*Id.,* at p. 1142.)

On appeal, McQueen contended that the district's project description was incomplete and misleading. (202 Cal.App.3d at p. 1143.) The district responded that he had failed to exhaust administrative remedies. (*Id.,* at p. 1150.) The court disagreed: "We consider petitioner's situation tantamount to a lack of notice due to the incomplete and misleading project description employed by the district. While there is evidence the district gave notice of the proposed property acquisition, there is no evidence that the notice mentioned the acquisition of toxic, hazardous substances." (*Ibid.*) It added, however: "Considering the manner in which the district's proposed plans for acquisition were publicized, we conclude petitioner adequately raised the objections available at the time." (*Id.,* at p. 1151.) "Petitioner questioned the district about Hodge's letter at its next meeting. When he was informed the project was categorically exempt, he wrote a letter challenging that determination. . . . We conclude he adequately exhausted the limited administrative remedies available." (*Ibid.*)

We read *McQueen* as holding that an incomplete or misleading notice may be treated as equivalent to *no* notice only to the extent that the notice's deficiencies prevented the petitioner from invoking administrative remedies. The petitioner still must raise the objections and exhaust the administrative remedies available at the time. Here, the District made it clear at the public hearing that the Project represented a modification of the 1984 Program. The Luiseños, however, did not object that the project description was inaccurate; they never asserted that the project description failed to mention the 1984 Program. This failure to exhaust their administrative remedies bars them from raising this issue now.

B.  *Consideration of Combined Effects.*

■ The District contends that the Luiseños' entire challenge is barred because it is in effect a challenge to the 1984 Program, as to which the statute of limitations has run. (See § 21167, subds. (a), (b), (e).) The Luiseños contend, however, that we can still consider "cumulative effects" of the Project and the 1984 Program, supposedly including the lowering of the groundwater level and the degradation of groundwater quality.

Aside from the relevant statute, the District cites no authority for its contention concerning the statute of limitations. Obviously, a challenge to the negative declaration for the 1984 Program is barred. A challenge to the negative declaration for the Project, however, is not. The threshold issue is whether such a challenge may reach *all* environmental effects of the Project, or whether, on the other hand, it is limited to the incremental difference between the effects of the Project and the effects of the 1984 Program.

A number of cases have held that the effects of a project may be sufficiently significant to require an EIR even though they are equivalent to the effects of an already approved project. In *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229 [227 Cal.Rptr. 899], a hotel property was within a coastal land-use plan (LUP). (*Id.*, at p. 233.) The LUP was exempt from CEQA. (*Id.*, at pp. 252-253.) Under the LUP, the property could still be used as a hotel, provided the owner obtained a special use permit; alternatively, one part of it could be residentially developed, provided the remainder, consisting of wetlands, was preserved. (*Id.*, at p. 233.) In order to obtain the special use permit and to continue operating its hotel, the property owner applied for rezoning of its property in conformity with the LUP; the property owner did not propose any residential development. (*Id.*, at p. 234.) The county adopted a negative declaration for the rezoning. (*Id.*, at pp. 234-235.)

On appeal, the property owner argued that the negative declaration was appropriate because the rezoning did not expand the use of the property beyond that already authorized under the LUP. The Court of Appeal was "not persuaded." (183 Cal.App.3d at p. 246.) It explained, "the process of preparation of the [LUP] itself does not require an EIR. The rezoning of a particular parcel, however, even if the result conforms with the plan, is a different matter, which necessarily requires a more detailed analysis." (*Id.*, at p. 253.) "In assessing the impact of the rezoning, it is only logical that the local agency examine the potential impact on the existing physical environment. The rezoning designation . . . includes uses which do not presently exist and which would significantly expand the present resort hotel use. This is the effect which must be analyzed. A comparison between what is possible under the LUP and what is possible under the rezoning bears no relation to real conditions on the ground." (*Id.*, at p. 246.) Accordingly, the court held that an EIR was required. (*Id.*, at pp. 244-249.)

Even more to the point, in *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180 [228 Cal.Rptr. 868], a city had certified an EIR in connection with issuance of a special use permit for the operation of a

landfill. Thereafter, in response to legislation requiring it to do so, it amended its general plan by designating the landfill area appropriate for solid waste management facilities. The city found that the amendment would have no environmental effects not already addressed in the previous EIR, and adopted a negative declaration. The trial court denied a petition for writ of mandate, agreeing that the amendment did not authorize any use not already authorized under the city's general plan and zoning ordinances. (*Id.*, at p. 185.)

On appeal, the city argued that the amendment had no significant environmental effect because a solid waste facility could have been located at the landfill site by special use permit under the existing general plan. The Court of Appeal disagreed. "At the time of the amendment, the hypothetically permitted facilities did not in fact exist at the landfill. . . . [A]n environmental analysis based on a comparison between what was possible under the existing general plan and what was permitted under the amendment was 'illusory.' " (184 Cal.App.3d at pp. 190-191, quoting *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317].) "In assessing the impact of the amendment, the local agency must examine the potential impact of the amendment on the existing physical environment; a comparison between the proposed amendment and the existing general plan is insufficient." (184 Cal.App.3d at pp. 186-187; see also *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1332 [232 Cal.Rptr. 507]; *Environmental Planning & Information Council* v. *County of El Dorado, supra*, 131 Cal.App.3d at pp. 354, 357-358.)

These cases were distinguished, however, in *Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467 [277 Cal.Rptr. 481]. There, a county adopted a negative declaration in connection with issuance of a use permit for construction of a winery. The property owner obtained building permits and commenced construction. Shortly thereafter, however, the property owner applied for a new use permit authorizing it to construct the planned winery in a different location. (*Id.*, at p. 1473.)

Initially, county staff treated the application as for a new permit. At a county planning commission meeting, however, county counsel instructed the commission to limit its consideration to the incremental effects of the relocation when compared to the original winery. Similarly, when the commission's determination was appealed to the county board of supervisors, on the advice of counsel, the board limited its consideration to the incremental effects of the relocation. (226 Cal.App.3d at pp. 1476-1477.) The county issued the new permit, and again adopted a negative declaration. (*Id.*, at p. 1473.)

On appeal, the court held that the county properly limited its consideration to the incremental effects of the relocation, as distinct from the total effects of the winery project. (226 Cal.App.3d at pp. 1475-1477, 1482.) It relied on the fact that ". . . the commission and board consistently treated the new application as if it were a request for modification of the already permitted project." (*Id.*, at p. 1476.) Therefore, the court viewed the county as essentially having determined that a supplemental environmental impact report (SEIR) was not required. (*Id.*, at pp. 1481-1482.)

In a footnote, the court distinguished the foregoing cases as follows: "In none of the cited cases had the projects in question undergone an earlier, final CEQA review. None involved permits that had already been issued or rights that had vested by the time the board made its decision. These cases do not involve the modification of an earlier permit which had become final, and on which CEQA review had been completed. In our case, the actual physical environment includes that which [the property owner] has a legal right to build under permits which have already been issued and on which construction has already begun." (226 Cal.App.3d at p. 1477, fn. 10.)

As we have noted, in *Christward*, the earlier landfill project *had* undergone CEQA review, resulting in an EIR. Likewise, in *City of Carmel-by-the-Sea*, the earlier LUP was exempt from CEQA and thus had, at least in a sense, undergone CEQA review. We believe what was critical to the court in *Benton* was that in the case before it, but not in these cases, it viewed the later project as a mere "modification to an earlier [project]" such that consideration of an SEIR was appropriate. When a lead agency is considering whether to prepare an SEIR, it is specifically authorized to limit its consideration of the later project to effects not considered in connection with the earlier project. (Guidelines, § 15162, subd. (a)(1).) Judicial review is concomitantly limited. Thus, "[i]f the statute of limitations has run on the previous approval, any challenge to the determination to change the project is limited to the legality of the agency's decision about whether to require a subsequent or supplemental EIR, or subsequent negative declaration, and the underlying EIR or negative declaration may not be attacked." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1993) § 23.26, p. 942.)

In the absence of such specific authorization, however, presumably the lead agency must consider all environmental effects of a new project. If the lead agency considers a new project standing alone, a court cannot substitute its judgment for that of the agency; it cannot consider only the new project's incremental effects as compared to some earlier project which the agency

never took into account. The courts are prohibited from cobbling together such "post hoc rationalizations" of agency decisions. (*Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 594 [284 Cal.Rptr. 498]; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1021 [192 Cal.Rptr. 325]; see *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278].)

Here, we believe the District essentially determined that the Project was not a substantial change in the 1984 Program, and hence that an SEIR was not required. The facts are strikingly similar to those in *Benton*. As the Luiseños correctly note, the initial study and proposed negative declaration did not so much as mention the 1984 Program. The initial study made no attempt to isolate the incremental effects of the Project. To the contrary, it recited that the Project "is being undertaken to recharge the Valle de Los Caballo[s] basins," and concluded that it would therefore have an effect on groundwater quantity, and possibly on groundwater flow, population and housing, even though these were effects of the 1984 Program. Thus, as in *Benton*, when the District's staff initially considered the project, they treated it as a new project, rather than as a modification of an earlier one.

At the public hearing, however, a District representative explained that the Project had already been approved as part of the 1984 Program; he introduced it as a "redesign[]" or "modification[]" of the original pipeline. After the Luiseños spoke out, the District's general manager responded that many of the potential environmental effects they had raised had already been addressed in connection with the 1984 Program. Another District representative (evidently its counsel) added that environmental review of the Project could appropriately "incorporate" the environmental documentation of the 1984 Program, and pointed out that the board was familiar with that environmental documentation. It is also noteworthy that in the trial court, counsel for the District argued that the District had properly determined that an SEIR was not required.

Thus, it appears that, as in *Benton*, the critical decisionmakers viewed the new project as a modification of an earlier one, and they considered only the incremental effects of the new project. Moreover, again as in *Benton*, the District had a right to proceed with the 1984 Program. It had commenced the 1984 Program by constructing wells, and perhaps also recharge areas and pump stations. It could have completed Pipeline A along the original route without further environmental review.

Before the District redefined the issue as whether an SEIR was required and limited its consideration to the incremental effects of the Project,

arguably it should have recirculated the proposed negative declaration. This would have enabled members of the public to take the 1984 Project into account, and to comment specifically on any perceived incremental effects. Again, however, because the Luiseños never contended that the negative declaration should be recirculated, the doctrine of exhaustion of administrative remedies would bar them from so contending now. (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794] [failure to exhaust bars claim that changes to draft EIR required recirculation]; see also *A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804 [16 Cal.Rptr.2d 358] [failure to exhaust bars claim that agency should have held hearing before determining SEIR not required].)

We conclude that judicial review of the Project's potential environmental effects is limited to incremental effects of the Project as compared to the 1984 Program. For example, the 1984 Program was expected to lower the groundwater level by up to 200 feet; the Luiseños cannot argue that this effect precluded the District from adopting a negative declaration for the Project.

The Luiseños, however, also contend that the *incremental* effects of the Project were such that the District was required to prepare an EIR. For example, they argue that the Project imports *more* water than the 1984 Program, and that this would have a significant effect on groundwater quality. We will consider these arguments in an unpublished portion of this opinion.

IX., X.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

XI.

DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and McKinster, J., concurred.

---

*See footnote, *ante,* page 425.